**UNITED STATES of America,**
**Appellee,**

v.

**REGENT OFFICE SUPPLY CO., Inc.,**
**and Oxford Office Systems, Inc.,**
**Appellants.**

No. 169, Docket 33498.

United States Court of Appeals,
Second Circuit.

Argued Oct. 8, 1969.

Decided Jan. 29, 1970.

Jacob P. Lefkowitz, New York City (Abraham Glasser, New York City, of counsel), for appellants.

Richard A. Givens, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, New York City, and John E. Sprizzo, Asst. U. S. Atty., on the brief), for appellee.

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

MOORE, Circuit Judge.

Regent Office Supply, Inc. (Regent) and Oxford Office Systems, Inc. (Oxford) were indicted and tried under a somewhat unusual procedure whereby the accused corporations, through their officers and their attorney, in effect agreed to be indicted and expeditiously tried upon certain "admissions and stipulations" of fact constituting the alleged crime. Through the indictment and the one-day trial, both defendants and the government were interested primarily in ascertaining whether or not the admitted conduct fell within the prohibition of 18 U.S.C. § 1341, the federal mail fraud statute.

Having been convicted—much to their chagrin—by the District Court, defendants sought to challenge the jurisdiction of the court by a post-verdict, pre-sentence motion to dismiss the indictment, protesting the irregularity of the pre-indictment procedure in which originally they had cooperated so enthusiastically with the government.

On this appeal from conviction and sentence, appellants renew their challenge to the justiciability of the issue as presented by the (at least cooperative) indictment. They further protest their own stipulation as to the presence of the

jurisdictional element of the crime—use of the mails—and they continue to challenge the applicability of the mail fraud statute to their admittedly deceitful operation. Rounding out their attack on the conviction, they register broad assertions of due process violations in the present application of an otherwise constitutional statute and, for the finale, suggest that the statute itself is unconstitutionally vague.

## I. JURISDICTION

The appellants are in the business of selling stationery supplies through salesmen (called "agents") who solicit orders for their merchandise by telephone. Worried by the dubious propriety of a "sales pitch," which according to their formal admission included "false pretenses and representations to customers," and probably even more worried by an investigation into their practices by the Post Office Department and the possibility of governmental prosecution, they adopted (obviously with the cooperation of the federal government) a procedure which they hoped would obtain for them (and the "sales pitch") the blessing of the courts. Accordingly they stipulated in writing that their agents "secured sales" by making false representations to potential customers that:

(a) the agent had been referred to the customer by a friend of the customer.

(b) the agent had been referred to customer firms by officers of such firms.

(c) the agent was a doctor, or other professional person, who had stationery to be disposed of.

(d) stationery of friends of the agent had to be disposed of because of a death and that the customer would help to relieve this difficult situation by purchasing it.

So anxious were the accused parties to have judicially approved—or disap-

proved—their salesmen's customer approach that they sought an immediate trial even to the extent of waiving "trial by jury if indicted for mail fraud in violation of 18 U.S.C. sec. 1341" and agreeing "to stand trial on the basis of these admissions * * * and stipulations, reserving, however, the right to offer testimony to amplify, but not to contradict, the facts contained in these admissions and stipulations." They quite candidly stipulated that they wished "to submit to the court the issue whether a procedure or plan to sell stationery [as described above] constitutes a scheme to defraud or to obtain money by false or fraudulent representations or [promises] within the meaning of 18 U.S.C. Sec. 1341." If the court should so find against them they stipulated that "judgment may be entered against the corporations."

The indictment (undated) was filed on October 3, 1968. Since the grand jury minutes were not transcribed (delivery and transcription were waived by the defendants), this Court is not aware of what, if anything, was presented to the grand jury.[1] The only description of any false and fraudulent pretenses is the enumeration, in substance, of the (a), (b), (c) and (d) of the stipulation.

With lightning speed Regent and Oxford pleaded not guilty and waived jury trial. The trial commenced and concluded on October 16, 1968. The government's case consisted entirely of the defendants' stipulation. The reaction, if any, of any customers to the representations or the effect, if any, of such reaction on the commercial transactions was not revealed. On the stipulation the government rested its case. Decision of the motion for acquittal was reserved.

For its defense, the accused corporations called the president of Regent, Harold Hartwig, who testified that the firms sell well-known, nationally advertised brands of stationery, such as Swingline staples, Faber pencils, Perma-

---

1. Although a Postal Inspector apparently testified before the grand jury, the stipu-
lation obviously must have been considered by it.

Write pens, etc., and some paper to large users among which are corporations such as Goodyear, General Electric and Rexall; that many of these customers provide a large volume of reorder business; that the Regent-Oxford enterprise has over 20,000 customers; that sales are made exclusively through their customers' purchasing agents; that the false representations listed in the stipulation were made as a preliminary part of the salesmen's solicitation; that price and quality of the merchandise are always discussed honestly; that the price offered has been lower than the purchasing agent is or was paying at the time of the solicitation; that the goods could be returned if found to be unsatisfactory; and that when a complaint is made an additional discount is offered to induce the customer to keep the goods.

Cross-examination elicited that visits to the Regent-Oxford offices had been made by the Better Business Bureau and by a Post Office Inspector; that the "lies" were to "get by" secretaries on the telephone and to get "the purchasing agent to listen to our agent"; and that for business reasons various fictitious names were used both for their companies in different localities and for individuals. A Postal Inspector then testified for the government as to an interview with Hartwig in which the description of the sales method used was merely reiterated.

The trial transcript reveals that following the presentation of this minimal evidence, some sixty pages of argument between court and counsel ensued, during which many hypothetical fact situations were posed, none of which are found in any testimony by salesmen *or* customers. The government advanced several theories. "The primary harm is in the circumstance of the person who is selling stationery in a legitimate way." (What might be the "legitimate way" was never disclosed.) Another "primary theory" was that "the person who is purchasing the item is also defrauded in another way, that he is entitled to give his patronage based on honest information, and if he wants to do somebody a favor and use his buying power for a charitable purpose or to reward his friends, he is entitled to do that, and not to be misled." (Again there was no proof of any such situation.) The government immediately backed away from "fraud" by relying on the disjunctive "false pretenses" language of the statute and when questioned by the trial court as to whether this would not be "the first time that there would be any judicial decision on obtaining property by false pretenses where there was no pecuniary harm done to the person from whom the property was obtained" replied, "On the precise facts this would be a case of first impression," and straightway turned to a case involving "charitable contributions." (United States v. Roth, 285 F.Supp. 364 [S.D.N.Y.1968]).

The government throughout insisted that what these purchasing agents "were after was to give business to a friend and/or to someone whose relatives had died." (No proof of this assumption appears in the record.) Little wonder that the trial court, with no factual background available, said, "It is pretty hard for me to pass on the question of whether the scheme was illegal or not, if I don't know what it was."

*The Opinion Below*

The trial court found that the defendants' conduct constituted a "scheme to defraud" but that there was "no evidence that defendants intended to get 'something for nothing,' United States v. Harrison, [Harrison v. United States] 200 F. 662 (6th Cir. 1912) from the customer or that any of their customers failed to receive merchandise of the quality promised." However, after thoroughly analyzing the many mail fraud cases, the court found the defendants guilty as charged. They received minimal fines for their violations, but they press this appeal because they are obliged to, in their words, "as a matter of their sheer business survival."

*The Post-Verdict Motion*

Faced with disapproval of their business practices in such annoyingly concrete form as an actual criminal conviction, it suddenly dawned on the Regent-Oxford strategists that "[t]his case possesses an apparently unique feature whose import defense counsel did not perceive until re-study of the case," namely, that it was not a "case or controversy" after all and they were "not aware that the federal criminal prosecutive jurisdiction may be set in operation in this manner," the "manner" being the "stipulation-indictment" procedure, an "ill-conceived purpose to obtain a constitutionally impermissible 'advisory opinion' from this Federal District Court" and that defendants, "finding themselves bedevilled by innovation-minded government officers, desired to find out where they stood and so the defendants joined hands with the government in practically writing their own 'test case' indictment, both sides thus cooperating to get an 'advisory opinion' from a United States District Court."

Were there not important issues here presented having serious commercial consequences, it might seem advisable to let the defendants suffer from their "imprudently avid" plan to obtain an advisory opinion by allowing the conviction to stand. However, cases "of first impression" have an obvious potential for creating precedents which might have far-reaching consequences, and we are not prepared to declare ourselves in favor of the departure in fraud prosecutions such a conviction might import on the hastily gathered and incomplete evidence before us in this case. The indictment was a skeleton at best and the stipulation did little to clothe it. Without a fuller factual disclosure than here afforded, we are confronted with the proposition of simply declaring that any untrue statement designed to obtain the sympathetic ear of a potential customer comes within the purview of the mail fraud statute. We believe it prudent to avoid this pitfall. To illustrate the dangers of rendering such an advisory opinion in this field:

(1) A salesman telephones saying "I am calling long distance from Chicago. I would like to speak to Mr. X (the purchasing agent)." Impressed by the long distance call the secretary puts Mr. X on the phone and as a result of the favorable offer the salesman then makes, he obtains an order. The salesman is sitting at his desk in New York—not in Chicago.

(2) A salesman tells a potential customer "we have an overly large inventory which must be reduced. For this reason I can give a very low price on nationally known merchandise." The inventory is in fact not large at all.

(3) The salesman says to the secretary "I am a very good friend of Mr. X (one of the company's officers)." The secretary puts the purchasing agent on the wire, and an order is successfully solicited. The salesman is not a very good friend and only met Mr. X once and quite casually at a cocktail party.

The courts cannot dwell in their ivory towers without descending occasionally into the market place where they will see day after day such signs as "GOING OUT OF BUSINESS IN 30 DAYS"; "FIRE SALE"; "BANKRUPTCY SALE" and many others designed to catch a prospective purchaser's eye. Query whether the word "defraud" covers or was intended to cover these inducements to enter into purchase transactions in which quality merchandise is acquired at discount prices. And yet the 30 days come and go, the fire, if any, is very inconsequential and only a portion of the goods was acquired from bankruptcy.

A resolution of all these hypothetical situations must await some future case. We simply note them here to demonstrate the dangers of rendering a decision on such speculative evidence as is presented by the stipulation procedure here, particularly where we are asked, in effect, to give approval or disapproval to the myriad of sales pitches used for var-

ious purposes in the diversified world of commerce.

■ For the present, we must decide initially whether there is jurisdiction over this case. What proof the government might have produced before the grand jury but for the stipulation we will never know. We do know, however, that an indictment was returned and that the case was submitted as an adversary proceeding. Borderline though this case may be we hold that there was jurisdiction.

## II. USE OF THE MAILS

Upon the stipulated facts, the only connection with the United States mail in the Regent-Oxford operation was the routine billing and receipt of money in consummation of the sales resulting from the deceptive initial contacts. Since the false representations were made in telephone conversations and not in correspondence carried through the mails, appellant argues that the jurisdictional element of the crime of mail fraud—use of the mails—is absent, and thus no jurisdiction exists under the mail fraud statute to prosecute them for their wilful misrepresentations.

■ The language of the statute itself prescribes criminal jurisdiction of a very broad scope, including the act of taking or receiving "any matter or thing whatever" through the mail "for the purpose of executing" a scheme or artifice to defraud. That receipt of money in consummation of a scheme to defraud falls within the meaning of that language was firmly settled by the Supreme Court in Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954). In *Pereira,* the government proved that the defendants were given a check, drawn on a California bank, by the victim of their confidence scheme. By presenting the check for payment at a bank in El Paso, Texas and collecting the proceeds, defendants "caused" the check to be sent through the mails, since transmission of the item by mail between the banks was the reasonably

foreseeable result of its presentation for payment. Thus prosecution of the fraud was cognizable under section 1341, because the mails were put in the service of defendants, however indirectly, in furtherance of their fraud. Considerably more direct use of the United States mail service was reasonably foreseeable in the normal course of the Regent-Oxford business operation, and the jurisdictional element of the crime is amply established by the facts stipulated.

## III. SCHEME TO DEFRAUD

■ The important substantive question on this appeal is: Does solicitation of a purchase by means of false representations not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain, constitute a "scheme to defraud" or "obtaining money by false pretenses" within the prohibition of 18 U.S.C. § 1341? We hold that, as here presented, it does not and the convictions should be reversed. We do not, however, condone the deceitfulness such business practices represent nor do we approve the cynical view advanced in defendants' rhetorical flourishes that such blatant dishonesty should be encouraged by reason of its "social utility" and "social necessity * * * in keeping with the most praiseworthy standards of business morality and worthy competitive enterprise." We do not find the practices defended by counsel to be "innocuous" or conduct "which at worst may evoke in the breast of the perfectionistic moral idealist a sense of reproach towards the imperfections of man's soul during the mortal span." On the contrary, we find these "white lies" repugnant to "standards of business morality." Nevertheless, the facts as stipulated in the case before us do not, in our view, constitute a scheme to defraud or to obtain money by false pretenses punishable under section 1341. But this is not to say that we could not, on different facts or more specific proof, arrive at a different conclusion.

The case presented by the Regent-Oxford operation is unique (as the govern-

ment, in effect, concedes) among prosecutions for violation of section 1341. The most nearly analogous cases sustaining convictions for mail fraud have involved sales tactics and representations which have tended to mislead the purchaser, or prospective purchaser, as to the quality or effectiveness of the thing being sold, or to mislead him with regard to the advantages of the bargain which should accrue to him. Thus claims or statements in advertising may go beyond mere puffing and enter the realm of fraud where the product must inherently fail to do what is claimed for it. United States v. Andreadis, 366 F.2d 423 (2d Cir. 1966), cert. denied, 385 U. S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967) (claim that "Regimen Tablets" could reduce weight without dieting contradicted scientific evidence); United States v. New South Farm and Home Company, 241 U.S. 64, 36 S.Ct. 505, 60 L.Ed. 890 (1916) (false representations regarding climate, ability to grow crops, and expected future improvements in promotion of land sales); Wilson v. United States, 190 F. 427 (2d Cir. 1911) (sale of intrinsically worthless stock). And promotion of an inherently useful item may also be fraud when the scheme of promotion is based on claims of additional benefits to accrue to the customer, if the benefits as represented are not realistically attainable by the customer. United States v. Armantrout, 411 F.2d 60, 64 (2d Cir. May 16, 1969) (carpet sold at inflated price on customer's expectation that defendant's "chain referral" scheme would return purchase price and produce profit for him); United States v. Baren, 305 F.2d 527 (2d Cir. 1962) (promotion of knitting machines on representation that women customers could easily make complicated knitted garmets for profitable resale, after it became known that average prospects could not so operate them). But see United States v. Rabinowitz, 327 F.2d 62 (6th Cir. 1964) (similar knitting machine promotion—conviction reversed for insufficiency of evidence to establish intent to defraud).

The government does not contend that the Regent-Oxford agents made any false representations regarding the quality or price of their nationally advertised merchandise. Nor is there any suggestion of material benefits which the customer might expect from the transaction beyond the inherent utility of the goods purchased and the discount price at which they were offered. Thus the present case cannot fall within either of the classes of commercial fraud cases we have previously considered. We must, therefore, examine the government's theory that fraud may exist in a commercial transaction even when the customer gets exactly what he expected and at the price he expected to pay. The government argues that the business conduct of the defendant corporations, as evidenced by the stipulation of false representations, constitutes fraud despite the absence of any evidence of tangible harm suffered by customers because of the bargain struck through the defendants' solicitations. Its argument, we believe, is grounded in a misplaced emphasis on the language, rather than the substance, of a long line of mail fraud cases.

 It is generally stated that there are two elements to the offense of mail fraud: use of the mails and a scheme to defraud. Since only a "scheme to defraud" and not actual fraud is required for conviction, we have said that "it is not essential that the Government allege or prove that purchasers were in fact defrauded." United States v. Andreadis, 366 F.2d 423, 431 (2d Cir. 1966). But this does not mean that the government can escape the burden of showing that some actual harm or injury was *contemplated* by the schemer. Proof that someone was actually defrauded is unnecessary simply because the critical element in a "scheme to defraud" is "fraudulent intent," Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896), and therefore the accused need not have succeeded in his scheme to be guilty of the crime. E. g., Pritchard v. United

States, 386 F.2d 760 (8th Cir. 1967); Adjmi v. United States, 346 F.2d 654 (5th Cir. 1965). But the purpose of the scheme "must be to injure, which doubtless may be inferred when the scheme has such effect as a necessary result of carrying it out." Horman v. United States, 116 F. 350, 352 (6th Cir. 1902). Of course proof that someone was actually victimized by the fraud is good evidence of the schemer's intent.

The government has offered no direct proof that any customer was actually defrauded by the Regent-Oxford selling campaign. Instead it offers a stipulation which shows that false representations were made, and that they were made by defendants' agents with knowledge of their falsehood. As a result of the transactions of which the untrue statements were a part, money and property changed hands. With no further proof, the government urges upon us the inference that customers were induced to part with their money because of the false representations, and that such calculated inducement amounted to fraud in the terminology of section 1341. The defendants helped the government over the difficult hurdle of proving that the false representations were "reasonably calculated" to induce purchasing agents of "ordinary prudence," see Silverman v. United States, 213 F.2d 405, 407 (5th Cir. 1954), to buy their wares by admitting in writing that the representations were made to secure sales. On this stipulation an intent to deceive, and even to induce, may have been shown; but this does not, without more, constitute the "fraudulent intent" required by the statute.

If there is no proof that the defendants expected to get "something for nothing," Harrison v. United States, 200 F. 662 (6th Cir. 1912) or that they intended to get more for their merchandise than it was worth to the average customer, it is difficult to see any intent to injure or to defraud in the defendants' falsehoods. Instead of offering proof of some tangible injury to the objects of the Regent-Oxford promotion, the government argues in the negative that "it is not essential * * * [to] * * * prove that purchasers were in fact defrauded," United States v. Andreadis, *supra*, and therefore that "pecuniary loss" need not be shown for fraud to exist. It may be true, as Judge Learned Hand stated in United States v. Rowe, 56 F.2d 747, 749 (2d Cir. 1932), that:

> * * * [a] man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him.

Nevertheless, neither the *Rowe* case nor the language quoted will support the conclusion that no definable harm need be contemplated by the accused to find him guilty of mail fraud. For that is what the government is arguing: that these false representations, in the context of a commercial transaction, are *per se* fraudulent despite the absence of any proof of actual injury to any customer. In the *Rowe* case, although the court felt that it was not necessary to measure the victims' loss in pecuniary terms, the injustice done was very real and made itself felt in the victims' pocketbook. The scheme as it was outlined in the opinion showed that the defendants, on the basis of gross misrepresentations of the value of certain pieces of land as well as a complicated structure of supporting false representations, had persuaded their victims to part with substantial sums of money in return for essentially worthless property. There was no question that the principal fraud lay in the defendants' representations that the property was worth much more than they knew it was in fact worth, thereby inducing the victims to part with their money on the basis of the inflated valuation, together with the other fabrications they wove for their purchasers. Although the land sold had some inherent utility, the false representations

grossly misled the victims of the scheme with regard to the bargain they were induced to enter by the representations. The defendants' representations regarding the value of the lots were unquestionably false representations of fact material to the bargain. Although the victims got something for their money —thus there was a quid pro quo—they were cheated out of the additional pecuniary benefits which the false representations led them reasonably to expect. Thus, taken in its factual context, the formulation of law stated in the *Rowe* decision was perfectly accurate in affirming that a wrong has been suffered when a man is deprived of his chance to bargain "with the facts before him" where the absent facts are facts material to the bargain he is induced thereby to enter.

■ We believe this to be a correct interpretation of *Rowe*, because we have found no case in which an intent to deceive has been equated with an "intent to defraud" where the deceit did not go to the nature of the bargain itself. Where the false representations are directed to the quality, adequacy or price of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain. In closer cases, where the representations do not mislead as to the quality, adequacy of inherent worth of the goods themselves, fraud in the bargaining may be inferable from facts indicating a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver. United States v. Baren, *supra*; see United States v. Andreadis, 366 F.2d at 431. In either instance, the intent of the schemer is to injure another to his own advantage by withholding or misrepresenting material facts. Although proof that the injury was accomplished is not required to convict under 1341, we believe the statute does require evidence from which it may be inferred that some actual injury to the victim, however slight, is a reasonably probable result of the deceitful representations if they are successful. See Horman v. United States, 116 F. 350, 352 (6th Cir. 1902).

■ The Regent-Oxford agents did not attempt to deceive their prospective customers with respect to the bargain they were offering; rather, they gave a false reason for being able to offer the bargain. There was no substitution of merchandise contrary to the customer's understanding of the offer, and no "quid pro quo of equal value" exchanged for the customer's money which did not meet his reasonable expectations. No customer testified that he felt he had been cheated. The government asks us to infer some injury from the mere fact of the falseness of the representations and their connection with a commercial transaction. On the evidence before us, consisting principally of the stipulated falsehoods and the testimony of the defendants' president, we conclude that the defendants intended to deceive their customers but they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception.

Having concluded that the conduct described in the defendant corporations' admissions and stipulations of fact does not come within the prohibition of the mail fraud statute, we need not pass upon their arguments with respect to the power of Congress under the Constitution to proscribe such deceitful business methods by appropriate legislation. Because the skeletal facts presented by the stipulation do not evidence a fraudulent scheme within the meaning of 18 U.S.C. § 1341, the convictions are reversed.