UNITED STATES of America, Appellee,

v.

Stephen H. LONDON, Defendant-Appellant.

No. 337, Docket 82–1232.

United States Court of Appeals, Second Circuit.

Argued Nov. 1, 1984.

Decided Jan. 9, 1985.

K. Chris Todd, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., and Marc J. Gottridge, Asst. U.S. Atty., New York City, on brief), for appellee.

Jay Goldberg, New York City (Scott B. Tulman, New York City, on brief), for defendant-appellant.

Before FEINBERG, Chief Judge, TIMBERS and MESKILL, Circuit Judges.

TIMBERS, Circuit Judge:

The sole question presented on this appeal is whether the district court's charge to the jury was adequate to require a finding of "contemplation of actual harm or injury" before the jury could convict appellant of participating in the scheme with which he was charged. We hold that it was.

Appellant Stephen H. London was convicted on June 29, 1982 of four counts of mail fraud and three counts of wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343 (1982). He was sentenced to a net eight year term of imprisonment, to be followed by a five year term of probation, and a

committed fine of $7,000 was imposed.[1] He is serving his sentence.

For the reasons stated below, we affirm.

## I.

Although appellant does not challenge the sufficiency of the evidence, we nevertheless shall summarize so much of it as we believe is necessary to an understanding of the context in which the challenged jury charge was given. In summarizing the evidence, we accept that version of it most favorable to the government, as we must at this stage of the case.

Essentially, the evidence established that London, a salesman for International Metals Exchange ("IME"), played a key role in a nationwide commodities fraud. More than 300 investors lost approximately $1,800,000. In short, it was a boiler room scam operation.

Appellant and his co-defendants were charged with use of the mails and interstate wires in furtherance of a fraudulent scheme to obtain money through the sale to the public of contracts for the "deferred delivery" of gold and silver by means of false and fraudulent pretenses, representations, and promises, in violation of the statutes referred to above.

IME was incorporated in October 1978 and operated until August 1979 out of a four room office, approximately 1200 to 1400 square feet in area, on Wall Street. IME sold contracts that gave the investor the right to pay for and accept delivery of gold or silver at a fixed price after a period of three to six months, or.to sell the contract to another investor during the contract period. The purchase price of the contract was used to pay IME's business overhead, its salesmen's commissions, and

---

**1.** London's co-defendant, Stephen R. Buzzi, who was tried with London and was convicted of the same offenses as London, was sentenced to a net twelve year term of imprisonment, to be followed by a five year term of probation, and a committed fine of $7,000 was imposed. His sentence of imprisonment was ordered to be served consecutively to a sentence imposed on him in the District of Massachusetts on March 19, 1981. Buzzi's conviction in the instant case was affirmed by our Court in an unpublished order entered December 15, 1982. *United States v. Buzzi*, Dkt. No. 82–1234.

Another co-defendant, Caesar Parisi, who was indicted with London and Buzzi, became hospitalized on the second day of the trial. His case was severed from that of the other two. We have not been informed of the disposition of Parisi's case.

the cost of having the contract covered by one of IME's wholesalers, New Era Precious Metals or Atlantic Coast Silver Exchange. The customer acquired no equity in the metal the contract allowed him to control. IME's wholesalers failed to cover the contracts IME sold. As a result, although IME's customers made money on paper, they lost their entire investment.

Appellant induced prospective investors to purchase the "deferred delivery" contracts for gold and silver by misrepresenting the history and reliability of IME, the riskiness of the investment, and the nature of the contracts. According to four of appellant's customers who testified for the government at trial, appellant stated that IME was a long-established company dealing on Wall Street for seven or eight years in the precious metals market; that IME was a broker on Wall Street which could buy, store, sell, deliver, insure and obtain whatever the investor needed; that IME purchased the gold for its contracts on the Commodities Exchange in New York City; that IME was an established brokerage house which could handle all of its customers' investments; that IME was registered with the Commodities Futures Trading Commission ("CFTC"); that Arabs were investing large amounts of money with IME; that IME had a staff of fully qualified experts who would advise the investors during the contract period; and that IME would send to its investors each month literature pertaining to the market with predictions regarding its movement. Appellant's customers also testified that appellant stated that the contract they were buying was like a lay-away plan in which the customer made an initial down payment and paid the balance when it came time to take delivery of the gold; that all costs and commissions were equal to three percent of the investor's initial payment, and the rest of the payment was a down payment on the metal being purchased for the customer; that IME's charges were three percent of the total cost of the metal (which was still less than one-fourth of the customer's initial payment); and that the contract involved a minimum down payment on a deferred payment purchase which gave the customer complete ownership of the metal during the period of the contract.

It was not until the customers had agreed to make a purchase and mailed or wired their payment to IME that they were allowed to see the contract terms in writing. Appellant's customers testified that appellant refused to send them the contract before they paid for it, explaining to them that if they had a copy of the contract it would mean that the gold or silver was theirs. The contract made clear that none of the initial payment represented a down payment on the gold or silver, and that all of the money was IME's nonrefundable fee.

Appellant induced his customers to invest their money in IME's contracts by creating the illusion that IME was a bona fide brokerage firm with traders who were members of a commodities exchange with trading privileges. Appellant told his customers that, when they agreed to purchase a contract, he would connect them to his "man on the floor" or to his "man on the floor of the exchange", who would give them a price and a transaction number. When he connected them to this person, the customers would hear the sounds and noise level associated with a commodities exchange. Afterwards, the phone would click again and appellant would finish the conversation. Appellant testified that he did not intend that his customers should think that he was working on a commodities exchange when he made references to the "man on the floor of the exchange". He explained that he was referring only to a man sitting ten feet away from his desk in the salesroom with him at the office of IME. Appellant testified that, although he told one customer that once he spoke to the "man on the floor" he was committed, he was not trying to make that customer think that there was a trader on the floor of a commodities exchange placing an order for him while they were speaking.

Government witness Nancy Manheim, a clerk at IME, testified that she occasionally

heard the salesroom get very noisy with salesmen quoting prices to each other and pretending to place buy and sell orders; and that everyone at IME referred to the customers as "jerks" or "suckers" or "peasants". Miss Manheim further testified that appellant had told her that IME was a boiler room scam; that IME and its wholesalers were part of the same paper shop; that he had been a salesman in various other scams before IME and "just [gotten] out a step ahead of the sheriff"; and that he had worked out the IME scam with William Ranney, one of the founders of IME.

In defense, appellant testified that his customers were mistaken about the misrepresentations they attributed to him, and that he did not know that his customers' contracts were not being covered by the wholesalers. William Ranney testified that appellant had no reason to believe that the contracts were not being covered, and that he had never heard appellant make any misrepresentations to any customers.

The trial, which began on April 19, 1982, concluded on April 29, at which time the jury returned verdicts finding London and Buzzi guilty on all counts which were submitted to the jury.

## II.

On appeal, appellant claims that the district court's charge was inadequate because it failed to require a finding of "contemplation of actual harm or injury" before the jury could convict appellant of participating in the scheme with which he was charged. We disagree.

We could affirm on the ground that appellant failed to object to the charge at the time of trial. Fed.R.Crim.P. 30 in relevant part provides that "[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." We repeatedly have held in cases too numerous to cite that Rule 30 means just what it says, and failure to make time-ly objection to a charge at the time of trial constitutes a waiver of that objection.

Appellant, however, through his court appointed lawyer on appeal, claims that the error asserted is the kind of plain error that may be reviewed by this Court under Fed.R.Crim.P. 52(b). Preliminarily, it should be borne in mind that the Supreme Court has made clear that Rule 52(b) is to be used sparingly:

"Rule 52(b) was intended to afford a means for the prompt redress of miscarriages of justice. By its terms, recourse may be had to the Rule only on appeal from a trial infected with error so 'plain' the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it. The Rule thus reflects a careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed."

*United States v. Frady,* 456 U.S. 152, 163 (1982).

Appellant acknowledges that, since only a scheme to defraud, and not actual fraud, is required for conviction under the mail and wire fraud statutes, it is not necessary for the government to charge or prove that appellant's investors in fact were defrauded. *United States v. Andreadis,* 366 F.2d 423, 431 (2 Cir.1966), *cert. denied,* 385 U.S. 1001 (1967). Appellant asserts, however, that, since the government has the burden of showing that some actual harm or injury was contemplated by the schemer, *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1180 (2 Cir.1970), and the court failed to charge that contemplation of harm or injury was an essential element of the scheme charged, therefore there was plain error that may be noticed by our Court. Appellant's contention, if established, that the court failed to charge an essential element of mail and wire fraud, would amount to plain error. *United States v. Mazzei,* 700 F.2d 85, 87–88 (2 Cir.), *cert. denied,* 103 S.Ct. 2124 (1983).

The indictment charged appellant and his co-schemers with unlawfully, wilfully, and knowingly devising and intending to devise "a scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises ... to enrich [appellant and his] co-schemers through the sale to the public of contracts for the 'deferred delivery' of gold and silver by means of false and fraudulent pretenses, representations and promises.

.        .        .

In order to gain the confidence of the potential investors and to induce them to send their money to IME, [appellant and his] co-schemers employed a variety of false and misleading representations, pretenses, and promises, regarding, among other things, the risks and profitability of the contracts being sold by IME, the nature of the fee to be paid by the investors, whether the contracts were backed by actual gold or silver in the possession or control of IME, and the history and reliability of IME."

The indictment charged that specific misrepresentations had been made by appellant and his co-schemers. The court read the indictment to the jury, and stated that the offenses charged in the indictment were the elements that the government must prove to establish its case. The court further charged the jury that the government must prove beyond a reasonable doubt that appellant knowingly and wilfully aided and abetted, or devised, or intended to devise, a scheme to defraud substantially the same as the one charged in the indictment.

Appellant contends that the court's instruction "made it reasonably possible for the jury to return a guilty verdict without a finding that appellant participated in a scheme which contemplated harm or injury to its customers". In support of this contention, appellant relies chiefly on *United States v. Siegal,* 717 F.2d 9 (2 Cir.1983), and *Regent Office Supply, supra.* In both cases we stated that, in order to establish mail fraud, the prosecution must show that some harm or injury was contemplated by the alleged scheme. *Siegal, supra,* 717 F.2d at 14; *Regent Office Supply, supra,* 421 F.2d at 1180.

In *Siegal,* after making the statement from which appellant attempts to draw solace, we held that there was sufficient evidence to establish that the defendants engaged in a scheme to sell corporate property and use the cash proceeds for bribery and self-enrichment, thereby breaching their fiduciary duty to their corporate employer and its stockholders, and violating the wire fraud statute. *Id.,* 717 F.2d at 14. There is nothing in that case to indicate that it is error for a court to fail to charge a jury with the specific language "the prosecution must show that some harm or injury was contemplated by the scheme".

In *Regent Office Supply,* we held that "solicitation of a purchase by means of false representations *not directed* to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain", did not constitute mail fraud. *Id.,* 421 F.2d at 1179 (emphasis added). Contemplation of harm or injury must be shown to establish mail fraud, but it may be inferred " 'when the scheme has such effect as a necessary result of carrying it out.' " *Id.* at 1181 (citation omitted). Appellant asserts that he believed that his customers' contracts were covered by IME's wholesalers. He further asserts that, since all of his customers made money on paper, and therefore would not have been injured had the contracts been covered, his scheme to induce them to invest in the contracts did not have the effect of injuring them as a "necessary result of carrying it out". *Id.* Appellant ignores, however, our holding in *Regent Office Supply* that "[w]here the false representations *are directed* to the quality, adequacy or price of the goods themselves, the fraudulent intent is apparent because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain". *Id.* at 1182 (emphasis added). It is irrelevant whether or not appellant believed that the contracts were being cover-

ed. He was charged with participating in a scheme to defraud and to obtain money through the sale of "deferred delivery" contracts by means of misrepresentations directed to the nature of the bargain, including the history and reliability of the company writing the contracts, the riskiness of the investment, and the nature of the contracts and the customer's payment. Thus, the intent to injure or harm required to be shown for mail fraud was apparent from the specific charges set forth in the indictment. Of course, an instruction by the court to the jury explicitly stating that the prosecution must show that some harm or injury was contemplated by the scheme would be entirely appropriate, indeed preferable, in this context.

Appellant contends that his misrepresentations were mere "puffing" insufficient to establish a violation of the mail fraud statute. He relies on *United States v. Pearlstein,* 576 F.2d 531 (3 Cir.1978), as support for his contention that his conviction must be reversed even if his statements can be characterized as misrepresentations, since they do not establish that he was aware that the contracts were not being covered. In *Pearlstein,* the government charged that the salesmen knowingly participated in a fraudulent scheme for marketing pen distributorships. In deciding whether the evidence presented at trial was sufficient to support the conviction of the distributorship salesmen, the court held that there was no evidence from which the jury reasonably could have concluded that the salesmen knew or should have known that the statements they made in their sales pitches were false. The court further held that, even if the salesmen's statements were characterized as fraudulent misrepresentations, they would not establish that the salesmen knew of the fraudulent purpose underlying the pen distributorship scheme. *Id.* at 544. Since this was the only scheme to defraud which was charged and proven by the government, and since

"there was no evidence ... of the sort of concerted action on the part of the defendants, nor of the planning or pattern which have been recognized as the hallmarks of a fraudulent scheme", the court reversed the convictions. *Id.* at 545. In the instant case, the indictment charged a scheme to defraud and obtain money through the sale of contracts by misrepresenting, among other things, the nature of the contract, the fee to be paid by the investor, and the history and reliability of IME. The government proved its charges and, in so doing, demonstrated one of the "hallmarks of a fraudulent scheme", *id.* at 545, by showing a concerted effort on the part of appellant and his co-schemers to deceive IME's customers into believing that IME was a bona fide brokerage firm with a "man on the floor of the exchange".

### III.

To summarize: While we have made clear that to prove mail fraud the government must show that the scheme charged contemplated harm or injury, here, the government has made the requisite showing by charging and proving that appellant solicited purchases by means of false representations directed to the nature of the bargain. In instructing the jury that the government must prove beyond a reasonable doubt that appellant knowingly and wilfully aided and abetted, or devised, or intended to devise, a scheme to defraud substantially the same as the one charged in the indictment, the court adequately instructed the jury that it could not return a guilty verdict without a finding that appellant participated in a scheme which contemplated harm or injury to his customers. Since appellant has not satisfied us that the court failed to charge an essential element of mail and wire fraud, he has not established the plain error necessary for us to grant relief under Fed.R.Crim.P. 52(b).[2]

Affirmed.

---

**2.** At the oral argument of this appeal on November 1, 1984, the Court *sua sponte* asked counsel for both sides why two years and four months had elapsed between the date of conviction and

the date of argument of the appeal, especially in a case where appellant was incarcerated.

The following is the sequence of events, so we have been informed: Following appellant's con-

viction on June 29, 1982, his trial counsel filed a timely notice of appeal on June 30, 1982. Thereafter, on August 10 and 24, 1982, the Clerk of our Court received two letters from appellant requesting assignment of counsel to perfect his appeal. We have been informed that, since appellant was represented by counsel at the time, the Clerk forwarded the letters to appellant's counsel. According to the Assistant United States Attorney who argued the appeal before us on November 1, 1984, the government knew that appellant's letters had been received, but took no action due to a change in personnel in the United States Attorney's Office. Since the Clerk had received no brief from appellant or his counsel, the appeal was dismissed on October 27, 1982. No further action was taken until May 14, 1984, when the Assistant United States Attorney wrote to the Clerk informing her that

the government would not oppose a motion to reinstate the appeal. On June 1, 1984, appellant, *pro se,* filed a motion with our Court for reinstatement of his appeal, release pending appeal and assignment of counsel. On June 28, 1984, we granted appellant's motion for reinstatement of his appeal, but denied his motion for release pending appeal. On July 17, 1984, we appointed counsel to represent appellant on appeal pursuant to the Criminal Justice Act. Appointed counsel thereafter filed an excellent brief and argued the appeal ably before us.

Based on the sequence of events set forth above, the processing of this appeal is hardly a model of the expeditious appellate procedure expected in our Court. We trust that all participants will take appropriate measures to insure that it does not happen again.