UNITED STATES of America,
Plaintiff-Appellee,

v.

Walter **PRITCHARD**,
Defendant-Appellant.

No. 84–1855.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 7, 1985.

Decided Sept. 20, 1985.

Andrea L. Davis, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Stephen M. Connolly, Chicago, Ill., for defendant-appellant.

Before WOOD, CUDAHY and FLAUM, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Appellant Walter Dewey Pritchard, a.k.a. Wally-the-Wiretapper, *see United States v. Pritchard*, 745 F.2d 1112, 1117 (7th Cir. 1984), was convicted in a bench trial of five counts of wire fraud in violation of 18

U.S.C. § 1343 and one count of possession of electronic eavesdropping equipment in violation of 18 U.S.C. § 2512(1)(b). Judge Bua sentenced Pritchard to two years imprisonment on the each of the mail fraud counts, the sentences to run concurrently with each other, and two years probation on the illegal possession count provided the defendant make restitution to the defrauded companies for merchandise delivered, and participate in an alcohol treatment program. Pritchard appeals, contending that the evidence presented at trial is insufficient to support his conviction on any of the six counts.

## I.

On January 9, 1984, undaunted by his recent convictions for possession of firearms and surreptitious listening devices, *see Pritchard*, 745 F.2d 1112 (7th Cir.1984), and while his appeal of those convictions was pending in this court, Pritchard called Buffalo Medical Specialists Manufacturing, Inc. ("BMS"), a medical supply wholesaler located in St. Petersburg, Florida. Using the alias K. O'Brien, Pritchard told Marshal Brewer, a supervisor at BMS, that he wanted to purchase an electronic stethoscope to use on doors, windows, and safes. Since BMS does not make retail sales, Brewer referred Pritchard to Metro Medical Home Care, Inc. ("MMHC"), a Chicago retailer selling BMS products.

In accordance with Brewer's suggestion Pritchard telephoned MMHC. Identifying himself as Mr. Pritchard, a representative from the Special Investigations Unit of the State of Illinois, Pritchard told Store Manager Greg Skelly that he needed an electronic stethoscope in order to listen through walls. Mr. Skelly informed Pritchard that MMHS did not have the stethoscope in stock, but that he could order it for Pritchard from the wholesaler, BMS. Concerned about the delay ordering from the wholesaler might occasion, Pritchard explained the urgency of his need for the stethoscope and asked Skelly if there was any way delivery could be expedited. Skelly offered to have the wholesaler ship the stethoscope directly to Pritchard. Satisfied, Pritchard ordered the stethoscope. Pritchard gave Skelly a purchase order number and special reference number and directed him to ship the stethoscope to K. O'Brien, 188 West Randolph, Chicago, Illinois, 60601, Special Investigations. Pritchard also gave Skelly his Marietta Answering Service number—994-7365.

BMS shipped the stethoscope the following day by UPS next day air service. The shipment was addressed to Karen O'Brien, 188 West Randolph, Chicago, Il. 60601, Attn: Spc. Inv. UPS failed to make the delivery, however, because it was unable to locate a K. O'Brien at 188 West Randolph St., the address of a large office building with many offices. When BMS called Pritchard to explain the difficulty with delivery Pritchard told BMS to try reshipping, this time to room 1226 at 188 Randolph and without abbreviating "Special Investigations."

Room 1226 is the address of a law office in the building at 188 Randolph. The lawyers are not affiliated with the State or the Illinois Division of Criminal Investigations. Although Pritchard is permitted to receive mail at the law office, he does not work or have an office or phone there. BMS reshipped the stethoscope on January 25 and successfully made delivery to room 1226.

On January 11, two days after placing the order with MMHC, Pritchard called Edmund Scientific, a New Jersey mail order company, to order more tools: a deluxe parabolic mike, a bug detector, a bionic ear, a pocket size electronic stethoscope, a subliminal memory tape, an auto induction relaxation cassette, a relaxation training program, a micro-cassette and recorder, and some electronic surveillance equipment. Pritchard gave Edmund a purchase order number and asked that the merchandise be shipped to: State of Illinois, c/o Pritchard, Special Investigations, State of Illinois Building, 188 West Randolph Street, Chicago, Il. 60601. Since the account was new the order form was routed to Dilip Pandya, Edmund's financial administrative controller, for a credit check. Seeking to verify

the credit information on the new account, Pandya called Pritchard at the number given on the order form. The person answering used the identifier "State of Illinois." Pandya asked to speak with Mr. Pritchard and Pritchard answered. Pandya explained to Pritchard that State orders are usually followed up by confirming purchase orders and asked Pritchard to send a confirming purchase order. Without bothering to correct Pandya's mistaken belief that the order was for the State, Pritchard assured Pandya that a confirming purchase order would be sent as soon as the tools were received. When Pandya expressed surprise that the government would order these "consumer items" Pritchard explained that he was placing the order for his "bosses." Convinced of the legitimacy of Pritchard's order, Pandya released the order for shipping. Edmund shipped part of the order on January 12, and the remaining portion on January 16. The two shipments were delivered to room 1226 on January 13 and 23, respectively.

On January 17 Pritchard placed another telephone order with Edmund for a variety of other tools. Soon thereafter Pandya called Pritchard, once again to ask for the confirming purchase order. Again Pritchard assured Pandya that he would send the confirming purchase order as soon as he had received the merchandise. On January 19 Pritchard placed yet another order with Edmund on the State of Illinois account.

Meanwhile, back at the Illinois Division of Criminal Investigations ("IDCI") Pritchard's first invoice with Edmund arrived. Perplexed by the fact that there was no Illinois Office of Special Investigation, a representative of IDCI, Roger Shiel, called Edmund to inquire about the invoice. Shiel informed Edmund that Pritchard was not an employee of the State of Illinois and that there was no Office of Special Investigations. On to Pritchard's scam, Edmund and the Illinois Division of Criminal Investigations began plotting to snare Wally, our wiley tapper.

Pandya called Pritchard to inform him that Edmund would have to back order some of the items. At Shiel's direction, Pandya also told Pritchard that to get the items on back order Pritchard must speak with Edmund's midwest representative, Roger Tanner. Pandya then gave Pritchard the phone number for Shiel.

Pritchard, unaware of the trap, called Tanner (really Shiel). Later the same day Tanner (Shiel) called Pritchard at 944–7365 and asked for State of Illinois, Office of Special Investigations, Mr. Pritchard. He was connected with Pritchard. The next day Shiel and Pritchard spoke again over the phone and arranged for Pritchard to pick up his packages from Edmund at the UPS facility on Jefferson Street, Chicago.

Anxious to receive the package, Pritchard proceeded directly to the Jefferson Street facility to pick up the packages. He told the counter clerk, an undercover special agent with IDCI, that he wanted the packages for the State of Illinois, c/o Walter Pritchard. Several agents at the facility attempted to follow Pritchard as he left the facility but Pritchard, savvy private eye that he is, sensed that he was being followed and managed to evade his pursuers.

Concerned that the authorities were on to him, Pritchard attempted to cover his tracks. On January 26 and 27 he called Pandya at Edmund to explain that he was not in fact an employee of the State of Illinois. Pritchard, apparently using the wiretapping skills for which he is well recognized, taped these two conversations with Pandya.

On February 2 two FBI agents arrested Pritchard in the hall of his apartment building on North Sheridan Road, Chicago. True to form, Pritchard was carrying a bag containing numerous tools of his trade, among them a "Slim Jim," a dent puller, a voltmeter, and a Ruby brand contact suction microphone with an amplifier and ear piece, a device primarily used for the surreptitious interception of wire or oral communications.

Up to the time of trial Pritchard had not attempted to make payment for the merchandise received from BMS and Edmund.

## II.

Pritchard argues that the evidence is insufficient to support his convictions for either wire fraud or possession of illegal eavesdropping equipment. In reviewing for sufficiency of the evidence we consider whether a factfinder, viewing the evidence in the light most favorable to the government, could find the defendant guilty beyond a reasonable doubt. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Moya,* 721 F.2d 606, 610 (7th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984). As we pointed out in *United States v. Redwine,* 715 F.2d 315, 319 (7th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984), "[t]he appellant mounting an evidentiary sufficiency challenge bears a 'heavy burden,' *United States v. Garcia,* 562 F.2d 411, 414 (7th Cir.1977) and thus '[o]nly when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.' *Brandom v. United States,* 431 F.2d 1391, 1400 (7th Cir.1970), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 634 (1971)."

### A. *Wire Fraud*

■. The government charged and convicted Pritchard of wire fraud under section 1343, Title 18 of the United States Code. The elements of wire fraud under section 1343 are: a scheme to defraud, a false representation, and use of interstate communications. 18 U.S.C. § 1343; *United States v. Cowart,* 595 F.2d 1023, 1031 n. 10 (5th Cir.1979).

■ The wire fraud charges are made in Counts I through V of the indictment. Count I concerns Pritchard's calls to MMHC and BMS on January 9; Counts II through V concern Pritchard's later calls to Edmund. Although Pritchard concedes sub silentio that the evidence is sufficient to support the finding that he falsely represented that he was a representative of the Special Investigation Unit of the State of

Illinois to MMHC (Count I), he challenges the sufficiency of the evidence that he made the same false representation to Edmund in telephone conversations on January 11, 17, and 19 (Counts II thru V).

The government presented more than sufficient evidence to establish the misrepresentations to Edmund. First the record contains three phone orders containing information Pritchard gave Edmund order takers. Pritchard argues that these forms contain no reference to the State of Illinois other than the reference to the State of Illinois Building in the shipping address. We disagree. The order forms all contain the account number 60601State01. Edmund creates its account numbers from the billing address zip code and the first five letters of the billing institution's name. Therefore, the fact that the account number contains the word "State" suggests that the caller (Pritchard) ordered the merchandise for the State of Illinois. Moreover, two of the three Edmund order forms (Exh. Nos. 8 & 9) contain the identifier "Special Investigations." Not coincidentally this is the same fictitious State of Illinois division for which Pritchard told Greg Skelly of MMHC that he worked. Finally, the order forms contain purchase order numbers. Since only companies or governmental agencies use purchase order numbers the presence of purchase order numbers on the order forms suggests that Pritchard represented that he was ordering for a company or a governmental agency, not for his own personal use.

In addition to the order forms, the government introduced computer printout invoices to establish the misrepresentation to Edmund. These invoices show that Edmund sold to "State of Illinois, Special Investigations, State of Illinois Building, 188 West Randolph Street, Chicago, Il. 60601." Pritchard argues that the invoice information must be the product of a clerical error. Although a possible explanation, there is no evidence in the record to support it; and we think it more plausible, indeed highly likely, absent any evidence to the contrary, that the invoices accurately reflect the in-

formation Pritchard gave the phone order takers.

Dilip Pandya, financial administrative controller at Edmund, testified that he called Pritchard several times to ask for a confirming purchase order for the State of Illinois orders; he also expressed surprise that a government agency would be ordering the items Pritchard ordered. In none of these conversations did Pritchard bother to correct Mr. Pandya's obvious mistaken belief that the orders were for the State of Illinois; rather Pritchard implicitly confirmed the belief by telling Mr. Pandya that he was ordering for his "bosses," and would send confirming purchase orders as soon as he received the merchandise. It was not until January 26, fifteen days after Mr. Pandya first called regarding the confirming purchase order, that Pritchard finally admitted to Mr. Pandya that he was in fact not affiliated with the State of Illinois, but rather with Walter Pritchard & Co. We think it highly suspect that Pritchard made this call the day after he had picked up the UPS packages and managed to evade the State Criminal Investigation officers who attempted to follow him from the UPS facility.

In his testimony Pritchard portrays the whole thing as nothing more than a little misunderstanding which arose because his mailing address was at the State of Illinois Building. We believe the evidence suggests something more than a little misunderstanding, rather a deliberate misrepresentation by Pritchard.

Pritchard's second argument on appeal of the wire fraud convictions is that the evidence is insufficient to establish that the phone call misrepresentations were made in furtherance of a scheme to defraud, that is, that the evidence does not establish that Pritchard intended to defraud the companies when he misrepresented his affiliation with the State. Pritchard relies heavily on *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970) to support his argument that no criminal intent was shown. The *Regent* court held that a defendant who is shown to have made false representations during the sale of goods cannot be held to have intended to defraud the purchasers under section 1341 where these misrepresentations did not concern the quality, adequacy, or inherent worth of the goods themselves [1] and the purchasers actually received the goods for which they bargained. We think this case is distinguishable from *Regent* because the misrepresentation is not collateral, but goes to the heart of the bargain, and because the companies have never received any part of the consideration for which they bargained.[2]

Pritchard contends that his misrepresentations were collateral to the bargain because even if he had identified himself "truthfully" as representing Walter Pritchard & Co., the companies would have extended credit on the strength of the purchase order numbers he provided. Although Pritchard's conclusion may follow from his premise,[3] his premise is not sup-

1. In *Regent* the phone salespersons made the following misrepresentations to potential customers: that the salesperson had been referred to the customer by a friend of the customer; that the stationery of a friend of the salesperson had to be disposed of because of a death and the customer could help to relieve this difficult situation by purchasing it; that the salesperson had been referred to the customer firms by officers of such firms; and that the salesperson was a doctor, or other professional person, who had stationery which needed to be disposed of. 421 F.2d at 1176.

2. Because *Regent* is distinguishable we need not and do not express a view on its vitality in this circuit. *See United States v. Castor*, 558 F.2d 379 (7th Cir.1977).

3. The companies testified without qualification that they extended credit to companies or governments on the strength of purchase order numbers but to individuals only with credit cards. Although we suspect that the company witnesses did not mean this categorically (that is, they do not extend credit on the strength of a purchase order number to just any company, but rather, only to those companies known to be credit worthy and to have purchase order departments) there was no testimony qualifying this testimony and we therefore must assume that they meant their testimony to be taken in a categorical sense. Therefore, on this record we agree with Pritchard that had Pritchard represented that he was from Walter Pritchard and Co. the companies would have extended him

ported by the record. That is, according to Pritchard's own testimony a *"truthful"* representation would have been that he was ordering on behalf of individuals (in some instances on behalf of Karen O'Brien, in other instances on behalf of Walter Pritchard), not on behalf of Walter Pritchard & Co. Tr. 237–39.

Whether Pritchard was ordering on behalf of an individual or rather a business or government agency was vitally important to the companies for it was credit information upon which they relied in deciding whether or not to ship the goods on the strength of purchase order numbers. If Pritchard had truthfully represented to the companies that he was purchasing on behalf of individuals O'Brien or Pritchard then the companies would *not* have shipped the goods, since their policy was only to ship to individuals on the strength of cash prepayment or a credit card. In short, Pritchard's misrepresentation as to his affiliation was not collateral to the bargain, but went to its heart, for it constituted crucial credit mis-information (who was purchasing the goods) upon which the companies relied in deciding to ship the goods to Pritchard.

This case is also different from *Regent* because whereas in *Regent* the customers received stationery of the same quality and type they had ordered, in this case Edmund and BMS never received any part of the consideration for which they bargained, that is, payment. It seems reasonable to assume that had Pritchard not intended to defraud the companies he would have paid for the goods once he received them. His failure to do so is strong evidence of his intent to defraud. *See United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180–81 (2d Cir.1970).

Finding that the misrepresentation in this case goes to the heart of the bargain (the purchaser's credit worthiness) and that the companies were injured (never actually receiving payment), we conclude that the evidence here, unlike in *Regent*, is sufficient to establish beyond a reasonable

credit on the strength of the purchase order

doubt that Pritchard intended to defraud the companies with his misrepresentations. *Cf. Regent,* 421 F.2d at 1180–82.

**B.** *Possession of an Illegal Electronic Device*

■ Pritchard challenges the sufficiency of the evidence to support his conviction on Count VII of the indictment charging possession of a device primarily useful for the surreptitious interception of wire or oral communications in violation of Title 18, United States Code, section 2512(1). Section 2512(1) provides in pertinent part that "any person who willfully ... (b) ... possesses ... any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of surreptitious interception of wire or oral communications" commits an offense against the United States. The phrase "electronic, mechanical, or other device" is defined in 18 U.S.C. § 2510(5) as "any device or apparatus which can be used to intercept a wire or oral communication," with certain inapplicable exceptions. The legislative history of section 2512 states

> The prohibitions are applicable to devices whose design renders them primarily useful for the surreptitious interception of private wire or oral communications. The statutory phrase is intended to establish a relatively narrow category of devices whose principal use is likely to be for wiretapping or eavesdropping. A device will not escape the prohibition merely because it may have innocent uses. The crucial test is whether the design of the device renders it *primarily* useful for *surreptitious* listening.

S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad. News 2112, 2183 (emphasis in original); *accord Pritchard,* 745 F.2d at 1122–23 (section 2512(1)(b) prohibits possession of electronic devices which, due to design characteristics, are primarily useful for surreptitious listening); *United States v.*

numbers he gave them.

*Schweihs*, 569 F.2d 965, 969 (5th Cir.1978) (to same effect).

The device at issue is a small gray metal box with an attached rubber suction cup and earphone and telephone hookup. Under the terms of the statute the issue is whether the design of this device renders it primarily useful for surreptitious interception of wire or oral communications. The government's electronics expert, FBI Agent Charles Wilmore, testified that he had examined and tested the device and concluded that it was primarily useful for the surreptitious interception of either wire or oral communication. Pritchard argues that Wilmore's testimony was rebutted by Dilip Pandya's testimony that he told Pritchard that the items he had ordered were considered "consumer items" not generally ordered by government entities. This testimony is of little assistance to Pritchard on the issue of the primary purpose of the device. First, Pandya, unlike Agent Wilmore, is not an expert on electronics, rather he is the financial controller at Edmund. Second, there is no evidence that the items ordered by Pritchard and referred to by Pandya include the device presented as an exhibit at trial. Third, we do not know how Pandya viewed the relationship between "consumer items" and "devices primarily used for surreptitious listening" (whether they were identical, intersecting, or mutually exclusive classes). Finally, even if Pandya's testimony were relevant, we think that Agent Wilmore's testimony is nonetheless sufficient to find the device primarily useful for surreptitious listening.

■ Pritchard also argues that, Agent Wilmore's testimony notwithstanding, the device does not, as a matter of law, fall within the prohibition of the statute because the statute only prohibits possession of devices whose form disguises their function and Pritchard's device looks like that which it is. The legislative history Pritchard cites to support his argument states that "[t]o be prohibited [under the statute], the device would ... have to possess attributes that give predominance to the surrep-

titous character of its use, such as the spike in the case of the spike mike or the disguised shape in the case of the martini olive transmitter...." S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News 2112, 2183–84. This legislative history does not support Pritchard's form disguising function argument. First, of the two examples given in the legislative history (spike mike and martini olive transmitter) only the martini olive transmitter has a form which disguises the device's function. The spiked form of the spike mike does not disguise its function, but merely aides in its surreptitious use. Moreover, the statutory language of section 2512(1)(b) does not limit the class of prohibited devices to those which look like something they are not. The statute prohibits devices possessing designs which render them primarily useful for surreptitious listening. In this case the device's design does not disguise the function but fits it perfectly: surreptitious listening through walls or doors. The device's design renders it primarily useful for surreptitious listening and knowing possession is therefore illegal under section 2512.

■ Finally Pritchard argues that it cannot be illegal to possess this device since section 2512 also prohibits the sale of such devices and Edmund, the seller of a similar device, was not prosecuted. The fact that one person is not prosecuted for his possible criminal conduct does not immunize another for engaging in the same or similar conduct.

We AFFIRM on all counts.