**UNITED STATES of America**

**v.**

**R. Foster WINANS, David Carpenter and Kenneth P. Felis, Defendants.**

**No. SS 84 Cr. 605 (CES).**

United States District Court, S.D. New York.

June 24, 1985.

As Amended July 24, 1985.

[redacted]

William M. Tendy, Acting U.S. Atty., S.D.N.Y. by Peter J. Romatowski, New York City, for plaintiff.

Buchwald & Kaufman by Don D. Buchwald, New York City, for defendant Winans.

Mudge Rose, Guthrie, Alexander & Ferdon by Jed S. Rakoff, Howard W. Goldstein, Caroline A. Riggio, New York City, for defendant Carpenter.

Brown, Wood, Ivey, Mitchell & Petty by E. Michael Bradley and I. Scott Bieler, New York City, for defendant Felis.

OPINION

STEWART, District Judge:

Defendants R. Foster Winans ("Winans"), David Carpenter ("Carpenter") and Kenneth P. Felis ("Felis") are charged in Counts Two through Sixty-One with participating in a scheme to trade in securities based on information misappropriated from the Wall Street Journal ("WSJ" or "the Journal"). The information allegedly stolen from the Journal was the timing, content and tenor of market-sensitive stories scheduled to appear in the paper. This conduct was allegedly in breach of a fiduciary duty owed to Winans' employer, Dow Jones & Co., the parent company of the Wall Street Journal. As such, Dow Jones was allegedly defrauded, and the indictment charges that these activities were in violation of Sections 10(b) and 32 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78ff and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343. All three defendants are also charged in Count One with conspiracy to violate those statutes and to obstruct justice by their agreement to cover up and obstruct any investigation of the scheme by disguising payments, by making false statements to Kidder Peabody, the WSJ and officers of the SEC, and by preparing false documents intended for submission to the SEC. Peter Brant, not a defendant in this action, is also named as a conspirator.[1]

Winans was a reporter at the Wall Street Journal, and one of the writers of the "Heard on the Street" column ("the *Heard* column"). Winans and Carpenter are homosexuals who have been involved in what they describe as a "spousal relationship" for over ten years. Carpenter also worked at the Wall Street Journal, but for a briefer period of time than Winans. Felis was a stockbroker at Kidder Peabody, who was brought into that brokerage firm by Peter Brant, the government's key witness in this prosecution. It is fair to say that Winans and Brant were the chief architects of this trading arrangement.

I

After a twenty-day trial, we find the facts as follows. Winans was originally hired by the Dow Jones News Service in late March 1981. Referred by Winans, David Carpenter was hired by Dow Jones as a news clerk in December of 1981. Beginning on February 2, 1981, it was the practice of the Journal to distribute to all new employees "The Inside Story," a forty-four-page pamphlet with seven pages devoted to the conflicts of interest policy. Winans denied ever receiving this booklet, or any other written conflicts policy, although he testified to receiving benefits information at the time of hire; "The Inside Story" does contain data on benefits, but Winans testified that the form of benefits information he received was distinct from this particular pamphlet. As for Carpenter, who worked at the Wall Street Journal for approximately one and a half

1. Brant pleaded guilty to an information in another action (84 Cr. 470) and in connection therewith entered into a plea agreement requiring his testimony in this prosecution. After the trial concluded, the government disclosed some additional evidence concerning the accounts of two of Brant's clients, Roger Wilson and David Clark. As indicated at the hearing on June 13, 1985, these new matters, summarized in the government's letter of June 10, 1985, have been considered in connection with Brant's credibility.

years, the government offers the same general practice testimony. However, Ms. Malloy, Personnel Manager for the New York region of Dow Jones, could not recall if she followed that practice with Carpenter, even though she was the one who conducted his orientation.

Winans received a promotion in the summer of 1982 when he became one of two full-time "Heard on the Street" writers. This column, the focus of the case, is a daily market gossip feature, which highlights a stock or group of stocks and analyzes notable volumes of trading or price movements occurring in the market. The *Heard* column reports both negative and positive information about its featured stocks, but also takes a point of view with respect to investment in the stocks that it reviews. Numerous witnesses, including Winans, testified that the column has an effect on the price of stocks mentioned in the column.[2] Testimony was presented by the defendants concerning the investment thesis of each column at issue in an attempt to show that price movements were related to factors other than the column's publication. We find that the *Heard* column does have an impact on the market, difficult though it may be to quantify in any particular case. It is certainly obvious that the defendants believed that the column had such an impact.

The Dow Jones Conflicts of Interest Policy is a three and one-half-page statement. It covers a number of subjects and specifically forbids the purchase or sale of securities on the basis of articles an employee knows will appear in the newspaper; it also states that employees should not disclose the paper's future contents to anyone outside the company. The policy also states that "all material gleaned by you in the course of your work for Dow Jones is deemed to be strictly the Company's property." Winans denied knowledge of any conflicts of interest policy, written or verbally conveyed, although he admitted that maintaining the confidentiality of the contents and timing of the columns was a "practice" of which he was aware.

Stewart Pinkerton, the New York Bureau Manager at the time of Winans' hire, testified to a conversation in which he told Winans of the confidential and sensitive nature of the *Heard* column, as well as the essentials of the conflicts of interest policy. Winans testified that this meeting was a brief "welcome aboard" talk, in which he and Pinkerton discussed salary and exchanged platitudes. Richard Rustin, who was Assistant Chief of the New York bureau and Winans' supervisor on the *Heard* column, testified that he too told Winans of the sensitivity of the column, and the importance of not investing in stocks the writer is covering. He also cautioned Winans that he should not let sources know what would be appearing in the column. Both Pinkerton and Rustin testified to follow-up reminders about the confidentiality of the column, after hearing rumors of leaks or having overheard Winans speak inappropriately to sources. Winans denies these conversations as well.

Seven months after Winans started to write the *Heard* column, on April 14, 1983, Pinkerton wrote Winans, summarizing a job performance discussion about errors in Winans' columns. Pinkerton wrote:

> As you were made aware last August when you were hired to do the Heard on the Street Column, it's one of the most important columns we run. People rely on its insight, accuracy and integrity. When trust begins to erode on anything the Journal does, it creates grave concern, but especially so with something as sensitive as the Heard column.

Moreover, shortly after Winans' move to the *Heard* column, on August 19, 1982, he wrote Pinkerton a letter disclosing his freelance activities and his plans to withdraw from them. Both these documents support Pinkerton's testimony that he and Winans had a substantive discussion about the ethical responsibilities associated with the

---

2. There is no claim that the column generally, or that any column in particular, contained corporate inside information or any hold for release material.

*Heard* column and conflicts of interest in general.

We find that Winans had actual knowledge of the policy with respect to maintaining the confidentiality of the column. His testimony carefully used the word "practice" as opposed to "policy," but the factual distinction is meaningless. Winans knew he would be fired if his conduct came to light. He knew that part of his job responsibilities were to keep the subject matter and the publication date of the column secret. He discussed the topic with his co-writer, Gary Putka, and cautioned a new writer, Ed Leefeldt, not to be too obvious about the column's subject when dealing with sources. Winans also knew that he was supposed to tell his editors if he heard that word was out about a column's topic. He told his editors about one leak prior to his arrangement with Brant. Even during the course of the scheme, while deliberately tipping to Brant, he went to his editor to say that a source was aware that they were working on a certain column. On neither occasion did the editor choose to kill the column, but Winans knew that it was part of his job to allow his employer that option.

Defendants argue that there is a legal significance to a distinction between the violation of a policy and the failure to adhere to a practice. The legal argument will be addressed below, but we believe it is unnecessary for us to make the fine, factual distinctions between knowledge of a policy and knowledge of a practice that the defendants would have us make. In any event, we accept the testimony of Pinkerton and Rustin. We also find incredible Winans denial that he ever received the conflicts of interest policy statements.

As for David Carpenter, the government argues that he too knew of the policy from his work as a news assistant on the national news desk. According to the testimony of Nancy Cardwell, the Night News Editor who supervised him at the time, part of Carpenter's job was to answer the phones. She testified that in performing that task, he often had to deflect callers who sought to learn about the appearance of an article. Sometime in January of 1983, Carpenter asked Cardwell how to look up the stock symbol for American Surgery; he said "that's my stock" and over the next few weeks, she noticed he would frequently check the price. She believes at some point he commented, "Foster likes that stock," but for all she knew, that meant Winans had written a column about it and he had read it. We find that Carpenter was aware generally of the policy.

The American Surgery investment is the first overt act alleged in the conspiracy count, although it is not charged as a substantive crime. In early January of 1983, Winans started looking into the company in connection with a possible article. On January 10 or 11 he purchased American Surgery stock for a brokerage account held in David Carpenter's name, at a total cost of $1,814.17. Two favorable *Heard* columns were written about the company and published on January 13, 1983 and March 23, 1983; the 400 shares of stock were sold on May 17, 1983 for $4,673.64. Similarly, he bought 1,000 shares of Institutional Investors stock in Carpenter's account on April 28, 1983, and a favorable article appeared on June 1, 1983; the Institutional Investors stock was sold five days later. A $497.59 profit was made on the initial $1,237.50 investment in Institutional Investors.

The government seeks to use the early trades in American Surgery and Institutional Investors as the beginning stages of the conspiracy, which Brant and Felis joined later, providing the know-how in securities trading and large-scale capital. While we are not persuaded by Winans' testimony that these purchases and sales were investment decisions entirely independent of the WSJ articles, we do not believe that any conspiratorial agreement existed at this time between Winans and Carpenter. The account at Merrill Lynch and the subsequent account at Charles Schwab & Co., Inc. (in which these trades were made) were in Carpenter's name, but Carpenter's involvement in the trading decisions was minimal. Winans filled out the applications

for the accounts, and either told Carpenter what trades to make or made them himself, identifying himself as Carpenter over the phone. Although Winans was keenly aware of the impropriety of the trading, we cannot accept the government's view of this trading as pursuant to a conspiracy between him and Carpenter.

American Surgery remains significant in that it indirectly led Winans to Peter Brant, when Mark Delotte, a public relations consultant for that company, put the two in touch. Delotte suggested Brant as a possible focus of an article about superbrokers. Brant was the number one broker at Kidder Peabody, with a commission income of $1.8 million for the fiscal year December 1982 through November 1983. Brant and Winans met for the first time in mid-May of 1983. While Brant was not enthusiastic about a possible article featuring him, they met again on June 1, 1983 to tour the Racquet Club and have dinner at "21". A third meeting on June 14 was intended to be an opportunity for Winans to observe Brant meeting with a new client, but the potential client cancelled; instead, the meeting was another general chat about investing philosophies and lifestyles. At all of these initial meetings, the discussion related to Brant's phenomenal market success, his personal wealth and flamboyant lifestyle.

From June of 1983 on, Brant became one of Winans' regular sources. He was quoted in an August 31, 1983 article, and quoted again, but not identified, in a September 2 column. Brant also invited Winans to a July 4th party on his boat, but Winans declined.

Brant and Winans present conflicting stories with respect to the birth of the scheme. Both testified to an October 12 meeting at the Racquet Club. According to Brant, nothing particularly significant took place that day, although there had been previous conversations in which he remarked to Winans about the coincidence of his own trading in two stocks, Apple Computer and Widergren, which later became subjects of *Heard* columns. Winans testified expansively to a meeting in which Brant turned the topic of conversation away from the broker and on to the reporter; they talked about Winans' work, career goals and financial situation. Winans testified that Brant brought up the coincidental trading in Apple more pointedly. According to Winans, Brant directly said, "You know, if I knew beforehand what was going to be in the column, we could make a lot of money." Winans testified that although the statement was made lightly, there was no doubt in his mind that Brant was not joking, but was making an offer. Brant denies this entirely.

This conflict in the testimony need not be resolved, since it is undisputed that the next weekend, Winans went out to Brant's house, and the two struck a deal on Sunday, October 16, 1983, on the Meadowbrook golf course on Long Island. They agreed that Winans would leak information to Brant with respect to the timing, subject and tenor of *Heard* columns so that Brant could trade in securities armed with that information. Both testified that it was part of the agreement that the arrangement would not affect the journalistic purity of Winans' writing. On Winans' side, the agreement would not influence his choice of topic or the contents of any article; he would continue to write balanced pieces, containing both negative and positive information. Brant was told that occasionally columns were killed or delayed because of a superseding newsworthy item. On Brant's end, the timing, volume and type of trading was totally in his hands. As for the distribution of profits, it seems to have been assumed that net profits were to be split after fifty percent was set aside for taxes. It also appears to have been assumed that Winans would receive nothing if there were no profits.

Brant states that Winans described Carpenter as someone he was close to, who would know of the arrangement. In response, Brant asked if Carpenter could be trusted; Winans assured him on this point. Winans testified that his reference to Carpenter was intended to let Brant know that

he was a homosexual as well as to see if there was any possibility of a part-time job for Carpenter. Brant says that he told Winans about Felis at that time, describing him as a business partner who would also participate; Winans testified that Brant told him about Felis a day or two later over the phone. Lastly, it was agreed that Brant would advance Winans $15,000, and that the check should be made out to Carpenter to avoid using Winans' name.

On that Sunday afternoon, Brant called Felis to tell him of the arrangement; Brant testified that Felis was enthusiastic. Winans went home and told Carpenter that he was going to be giving Brant stock ideas he picked up in his work and Brant would be giving him money. Carpenter's SEC testimony similarly reflects that, at first, Carpenter only knew of a business arrangement between Brant and Winans in the most general sense.

The following week, the agreement was put into effect. The advance from Brant was delivered to Winans; the $15,000 check was tucked inside a Kidder Peabody research report. Carpenter endorsed the check, and Winans deposited it the following day in their joint checking account. That Monday, October 17, 1983, Winans leaked to Brant that the *Heard* column for Tuesday was to be a positive column on oil drilling stocks. Stock and options in Schlumberger, Ltd., one of a number of companies mentioned, were bought in two accounts, one in Brant's name and a second in Felis' name, the latter jointly owned by Brant and Felis. The scheme began inauspiciously, when a more newsworthy article came up, and the oil drilling column was displaced and delayed by a day. The first trade resulted in a loss of $37,914.25 in Felis' account and $9,550.53 in Brant's account.

On October 18, 1983, Brant included David W.C. Clark, a client and friend, in the deal. Brant testified at trial that Clark was depressed and suicidal one night, and Brant told him of the plan and its profit potential in order to cheer him up. Felis' reaction to this addition was to state that "Clark is a pig and he'll get us all caught." Brant traded on information from Winans in Clark's accounts at Kidder Peabody beginning on October 19, 1983 despite this lack of enthusiasm. Winans was never aware of this trading, which is not included in any of the substantive counts; Winans only learned of Clark's existence at the time the SEC started asking questions.

The second trade was in TIE/Communciations, Inc., and resulted in a profit of over $100,000 in the Felis and Clark accounts. On October 20, 1983, Winans, Brant and Felis met for drinks at the Racquet Club and went out to dinner. The group discussed that there was a better profit potential in columns focusing on one stock, such as the column on TIE, rather than a column about a group of stocks, such as the mention of Schlumberger as one of a number of oil drilling companies. Felis suggested a flat fee of $25,000 per story for Winans. There was also some discussion about being careful not to attract attention.

The following weekend was spent at Brant's home again, with Carpenter accompanying Winans on this occasion. Apparently little business conversation took place, and Brant recalled none. In contrast to Brant's lack of recall, Winans and Carpenter testified to a conversation on the same golf course, but both Winans, at trial, and Carpenter, in his SEC testimony, described it as a general discussion about stocks and making a lot of money.

From this point in October until the end of February 1984, approximately twenty-seven articles were leaked in advance, not all of which were written by Winans. When the topic was set for the next day, Winans would call Brant. Winans could only recall one specific instance in which he called Felis, in connection with a story on Chicago-Milwaukee, although he thought that he may have called Felis additional times. His calls were generally made from a pay phone outside the WSJ building. He also used the name "Howard Cohen," or variations thereof, when calling Brant. Apparently, he was not very good at remembering his false name and sometimes

identified himself as Howard Kahn or Howard Winans.

The execution of the trades was entirely left to Brant, who testified that he would discuss the strategy with Felis and/or Clark. Depending on the positive or negative tone of the article, stock was either bought or sold short, and call or put options were either bought or sold. Most often, the transactions were closed on the same day as an article's publication, thereby maximizing its impact. The net profits amounted to almost $690,000, taking into account trading in all the accounts connected with the defendants.[3]

The distribution of profits was far from mathematically exact; it may be a coincidence that the $30,000 paid to Winans actually does reflect a one-third share of the after-tax profits from the Felis and Western Hemisphere accounts. Brant would generally inform Winans about making money on trades, but Winans does not appear to have been keeping careful track. He asked for money when he needed it. On November 10, 1983, Brant gave Winans 750 British pounds for Carpenter to use on his trip to London. On December 7, in response to another request from Winans in connection with a specific need, Brant wrote a check for $5,000. The last payment was a $10,000 check issued on January 26, 1984.

The $10,000 check written on January 26, 1984 has the handwritten notation "drapes" on it. Brant asked Felis to write the check. Since it was the first check Felis made out for Winans, he asked "What should I write on this thing, drapes?", to which Brant responded "Yes." While Brant initially testified that this justification for the payments had been previously discussed at his house, in a conversation between Felis, Carpenter and himself, he ultimately backtracked and equivocated, admitting that any such conversation that included both Carpenter and Felis might have taken place after the check was drawn; Brant did state that it was definitely discussed at a February 11, 1984 meeting. However, testimony from Gary Lickle, Brant's friend and attorney who was at the house that weekend, established that on February 11, Carpenter, Brant and Felis never had a private conversation. While this testimony is significant with regard to Carpenter, it means nothing with respect to Felis' knowledge at the time the check was written. He must have had some sort of conversation with Brant at the time he wrote the check, and it is irrelevant whether Brant told him to write the word "drapes" on the check or whether Felis brought it up. As Felis was aware, the check was not for decorating services; the addition of the word "drapes" was to establish a basis for saying that it was.

Nor do we understand defendant Felis' explanation that, in light of Brant's testimony that someone, maybe Carpenter, felt a need to have an explanation of how the payment should be declared as income for tax purposes, the worst this notation shows is a scheme to defraud the IRS. The fact remains that Brant and Felis recognized that there was a problem with the true source of the income, necessitating a false explanation for the payment.

Felis, Brant and Winans met two other times in addition to the October 20 meeting: once at the Racquet Club followed by dinner at Cafe Seiyokin in late October or early November, and once at Brant's house the weekend of February 11, 1984. Carpenter, Brant and Winans met a total of three times: during the October 22 weekend, for drinks and dinner in November of 1983, and during the above-mentioned February 11 weekend accompanied by Felis as well. After the Cafe Seiyokin evening, Winans objected to further meetings at the Racquet Club for fear of running into Wall Street or Wall Street Journal acquaintances.

The government argues that during the agreement's operation, the contents of

---

**3.** These accounts were in the following names: Clark, Felis, Carpenter, Winans, Western Hemisphere, Spratt and Brant.

three of Winans' stories were affected by the conspiracy, in that Winans pushed for publication of articles on Todd Shipyards and Petro Lewis over the objections of his colleague, Gary Putka, who disagreed with the contents and tenor thereof. However, those two instances appear to be only examples of a routine difference of opinion between Winans and Putka. If anything, the fact that the government has the opportunity to make this argument points out the difficulty of maintaining a stance of journalistic purity when the reporter is engaged in a decidedly unpure venture.[4]

More troubling is Winans' testimony at the SEC with respect to his January 19, 1984 article on Digital Switch. Digital Switch was a stock that had helped to make Brant rich. He was heavily invested in the stock, and it was not doing well. Indeed, both the government and the defendants point to the poor market status of this stock as Brant's motive for entering into the arrangement. Winans unequivocally testified at the SEC that Brant's promise of a big distribution of profits if he could get out of Digital Switch was "an inducement" and a factor in his choosing to write the January 19 article. At trial, Winans testified that he was trying to be helpful at the SEC, that this was the only time that Brant had connected their agreement with a story idea, and that in his SEC testimony he misspoke. While Brant may have been offering an inducement, Winans testified that the inducement did not affect his journalistic judgment in choosing to write the article; it was a newsworthy column which was written for that reason. That may be the case, but we do not accept his rejection of his SEC testimony; rather, we accept it as evidence of Winans' criminal intent.

Trading by Winans also continued in Carpenter's Schwab account during the time in which Winans was profiting from Brant's trading. Six trades took place in the Carpenter account, each on the day before an article appeared in the Wall Street Journal. Like the earlier trading in American Surgery and Institutional Investors, Carpenter's role in this trading was primarily ministerial, although as indicated in his SEC testimony, he was aware that these purchases and sales were connected with the appearance of articles in the Journal.

Felis used the information obtained from Winans beyond the scope of the original agreement. The topic and tone of forthcoming *Heard* articles was passed by him in seven instances to Douglas McCaskey, a stockbroker and an old college friend of Felis. Similarly, Felis tipped Stephen Spratt, his junior partner in his Connecticut business in four instances. Spratt's broker noticed the correlation between Spratt's transaction and a WSJ article in one such trade. Spratt called Felis, who said "you better change your account." Felis, in an obvious effort to conceal the conspiratorial scheme, told him to move accounts because his broker would start copying his trades, and Spratt would not get good service. At trial, Spratt also testified that Felis told him that there was nothing wrong with the trading, that it was just one of Brant's tips, and that an attorney had said it was legal; Spratt made no mention of this latter part of the conversation when he testified before the SEC.

On November 3, 1983, Kidder Peabody's Compliance Department noticed the correlation between *Heard* articles and trading in the Felis and Clark accounts. William Kennedy, New York Regional Manager for Kidder Peabody, asked Brant and Felis about the trades. Felis falsely stated that he was merely copying the trades of Clark, who Brant asserted got his information

---

**4.** Maintaining the journalistic purity of the column was actually consistent with the goals of the conspirators. As Winans testified, a particularly compelling column or a fresh investment thesis would have a significant impact on the price of the featured stock. As he stated, "The impact on the market told me the column was good." However, if false or slanted articles were published, the column's readers would very likely lose confidence in the column and cease to rely on it. As a result, its otherwise predictable impact on the market would be lost to the detriment of the conspirators and the possibility of discovery of the scheme by Winans' superiors would be enhanced.

from friends on Wall Street. Brant also falsely denied knowing anyone at the WSJ. Kennedy said that Felis' trading had to stop, and told Brant and Felis that he was going to seek legal advice with respect to Clark's unsolicited trades.

As a result of that meeting, Brant and Felis liquidated the Felis account and had a Kidder Peabody $275,000 check drawn to Morgan Guaranty. On November 4, 1983, the Kidder Peabody check was exchanged for a bank check payable to "Western Hemisphere Trade Corp. No. 2"; no transaction is reflected in Felis' account. Brant had already telephoned the Bank Institute of Zurich and made arrangements to open an account in the Western Hemisphere name in Switzerland.

Felis had already arranged a trip to Europe and opened the Swiss bank account in November while abroad. The Western Hemisphere Trade Corp. money was wired back to a new Kidder Peabody account, and trading on Winans' information continued, except now it was in the name of Western Hemisphere rather than in Felis' account at Kidder Peabody. Ultimately, the money from the Western Hemisphere account was split between Brant and Felis when the account was closed in March 1984.

After the November 3 meeting, Robert Krantz, the General Counsel of Kidder Peabody, asked the law firm of Sullivan & Cromwell for an opinion on the legality of Clark's trading. A preliminary memorandum was written at the law firm on the premise that Clark had an inside source at the WSJ. The memorandum concluded that Clark would be subject to criminal and SEC enforcement proceedings and might be subject to civil liability. Though the memorandum was a preliminary one, and the partner in charge at Sullivan & Cromwell was not entirely satisfied with it, Krantz went to see Clark (who is a lawyer) to stop the trading. He and Clark met on November 17, 1983, and he told Clark about Sullivan & Cromwell's conclusions. Clark denied having any source at the WSJ. The upshot of the encounter was that Clark stated that Brant was not being very help-

ful, and that he intended to move his trading to another brokerage firm. In fact, he did open an account at Bear Stearns and continued to trade on Winans' information.

Krantz's next stop on that day was to see Brant to explain why he had just encouraged one of Brant's valuable clients to take his business elsewhere. Krantz described his intentions as "handholding." By the time he got there, Brant told him that Clark had already called to say he was going to discontinue his trading. At this meeting, which Felis joined, Krantz recalled telling Brant and Felis that he did not know if the trading was legal or illegal, but "he had begun to think that there was some type of violation involved here if the material was in fact coming from the WSJ." Krantz was not sure if he specifically said anything about the Sullivan & Cromwell memorandum and its conclusions. When Brant asked him if they had done anything wrong, Krantz responded that he did not think so, and that he was not sure that Clark had done anything wrong either in light of *Dirks v. SEC*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). However, the entire conversation was premised on the assumption that if anyone had a tie to the WSJ, it was Clark, and all Brant and Felis had done was execute unsolicited orders and copy the trades. Nor did Krantz have any idea that there was a systematic plan to advance information with a Wall Street Journal reporter sharing in the profits.

On March 1, 1984, the SEC, having commenced an investigation, called Clark, who promptly informed Brant, who then passed the word along to Felis. Clark gave false answers to the agency's questions about the trading; he told the investigators that he had several sources on Wall Street. He told Brant he had sent them "up some blind alley" by mentioning unconnected individuals and brokerage firms. Clark also told them he did not know Winans. On the same day, Winans was called into a Wall Street Journal executive office, where Mr. Pearlstine, Managing Editor of the Journal, and Robert Sack, counsel to the Journal,

were also present. Although Winans was warned about the ramifications of giving false answers, he gave a number of patently untruthful responses to the SEC's questions. Specifically, he denied having any interest in a brokerage account in someone else's name and denied having received any money from Peter Brant.

That night, Carpenter called Brant and said that "the drapes are not hanging right," a none too subtle reference to the $10,000 check written by Felis a little over a month earlier. Winans sent Carpenter to meet Brant with a note reflecting what had been asked by the SEC and what his responses had been. Winans testified that the use of a written narrative was not part of any surreptitious plan to get their stories straight, but a reflection of his own lack of faith in Carpenter's memory; we accept his testimony that he did not want to rely on Carpenter's memory, but we reject the balance of this testimony. He also testified that he did not want the notes left with Brant. Carpenter and Brant met at Brant's Manhattan apartment. Upon learning that Winans denied receiving any money from Brant, Brant remarked that it was a good thing that the checks had been written out to Carpenter. To his dismay, he learned for the first time that the checks had been deposited in Carpenter's and Winans' joint checking account. Carpenter tried to get information from Brant about some of the names that the SEC had questioned Winans about, specifically Clark, and Brant's response was evasive. It is also unclear whether it was at this or a subsequent meeting that the preparation of false invoices to justify the payments as decorating services was discussed.

Winans met with Dow Jones attorneys and executives on March 2, 1984. At this point, there was no suggestion that Winans was involved in any improper conduct, and Winans did not tell his employer the truth. Over the following weekend, Carpenter went to Brant's Long Island home with another written narrative of Winans' conversations. At this time, Winans was aware that the checks were to be justified by attributing them to payments for deco-

rating services. He knew that Brant and Felis were putting pressure on Carpenter to prepare fake invoices to support that explanation.

Brant himself was contacted by the SEC on March 5, and he too did not tell the truth. A plan to go to Brazil with David Clark was made, but not carried out. In mid-March, Brant went to Florida with his family. Meanwhile, Winans hung on at the Wall Street Journal. Although he testified that he was suicidal during this time period, Winans was actually engaged in pursuing a new job outside the Journal and was even haggling with his employer about severance pay in mid-March.

The SEC investigation became formal on March 14. On March 21, 1984, Brant, Felis and Carpenter had a lunch-time meeting in New York. There was further discussion about the invoices, with an instruction from Felis not to have them in sequential order in light of the lapse of time between checks. That same night Brant, Felis, Carpenter and Winans met at Trader Vics in the Plaza Hotel. Carpenter finally produced the invoices either that evening or sometime earlier that afternoon; these documents are clumsily executed and are unsigned and undated.

The Trader Vics meeting was highly emotional. Winans was only there for part of the time, and Brant reassured him that nothing would happen. Brant said that he could say that in the course of his conversations with Winans as a source, he figured out what Winans was working on; the payments to Carpenter were explainable as decorating expenses. Carpenter had been drinking and was slightly hysterical. After Winans left, Carpenter, Felis and Brant got into a fight. Carpenter made vague threats about backing from gay and journalistic organizations. Brant and Felis tried to calm him down and made similar vague threats about the necessity of sticking to the story.

According to Winans' SEC testimony, Winans and Carpenter no longer trusted Brant and Felis. On March 29, Winans and

Carpenter voluntarily went to the SEC and testified fully about the scheme.

## II

The conspiracy count alleges a scheme beginning on or about January 1, 1983 and running until March 29, 1984. The defendants are alleged to have conspired to commit securities fraud, mail fraud and wire fraud, and to obstruct the SEC investigation by engaging in a cover-up and by making false statements to Kidder Peabody, the WSJ and the SEC. The January date for the birth of the plan reflects the government's view that the conspiracy originated between Winans and Carpenter. The early trades in American Surgery and Institutional Investors are the first overt acts identified in the indictment.

■ It is well-settled that the crime of conspiracy is an illegal agreement among conspirators for which a "meeting of the minds" is required. *See generally United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir.1977). There must be agreement as to the "essential nature" of the plan, and a "general agreement to engage in unspecified criminal conduct is insufficient to identify the essential nature of the conspiratorial plan." *Id.* at 38–39. Mere presence at the scene of a crime or mere association with conspirators is not enough to show membership in a conspiracy. *United States v. Martino*, 759 F.2d 998 (2d Cir. 1985). There must be some evidence that the defendant "associat[ed] himself with the venture in some fashion, 'participat[ed] in it as something that he wish[ed] to bring about,' or '[sought] by his action to make it succeed.'" *United States v. Johnson*, 513 F.2d 819, 823 (2d Cir.1975) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938).

Counts Two through Twenty-Five charge that the defendants "unlawfully, wilfully and knowingly, directly and indirectly, and by use of means and instrumentalities of foreign and interstate commerce, the mails, and the facilities of national securities exchanges, did (a) employ devices, schemes and artifices to defraud, and (b) engage in acts, practices and courses of business, which operated as a fraud and deceit on the Wall Street Journal and Dow Jones & Company, Inc., in connection with the purchase and sale of securities" in violation of 15 U.S.C. §§ 78j(b), 78ff, and Rule 10b–5 promulgated thereunder. 17 C.F.R. § 240.-10b–5. Each count relates to a specific transaction, with the first trade in Schlumberger, Ltd. taking place on October 17, 1983.[5]

■ The prosecution's theory in support of these securities counts is known as the misappropriation of information theory, which had its genesis in *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). Chiarella was a markup man at a financial printing firm. In the course of his employment, he deciphered the identity of companies targeted for takeovers or mergers, purchased stock in those companies and sold immediately after the plans became public, thereby making a substantial profit. Although his conviction was affirmed by the Second Circuit, the Supreme Court reversed, holding that Chiarella owed no duty to disclose his inside information to the sellers of the securities.

The Second Circuit had held that not only did Chiarella have such a duty to the sellers, but the Court also commented that he had breached a duty to his employer. In a footnote, the Court stated that the indictment

not only alleged that appellant's activities "operated as fraud and deceit upon the sellers of the aforementioned securities," it also charged a "scheme to defraud" in general terms. Clearly, violation of an agent's duty to respect client confidences, Restatement (2d) Agency § 395, transgresses Rule 10b–5 where, as

---

**5.** While Winans is named in all of the counts, Felis and Carpenter are not charged with each transaction. This is also true for the mail and wire fraud counts. With respect to the securities fraud counts, the government at the close of its case, dropped counts 19 and 25 charged against defendants Winans and Felis.

here, the converted information both concerned securities and was used to purchase and sell securities.

*United States v. Chiarella,* 588 F.2d 1358, 1368 n. 14 (2d Cir.1978), *rev'd,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). The Supreme Court refused to address the merits of the misappropriation theory on the ground that it had not been properly presented to the jury. *Chiarella, supra,* 445 U.S. at 236–37, 100 S.Ct. at 1118–19. In a dissenting opinion, Justice Burger (who believed the issue was properly before the court) heartily endorsed the Second Circuit approach, arguing that securities fraud need not only be premised on a relationship between the buyer and seller:

> In particular, the rule should give way when an informational advantage is obtained, not by superior experience, foresight and industry, but by some unlawful means.... I would read § 10(b) and Rule 10b–5 to encompass and build on this principle: to mean that a person who has misappropriated nonpublic information has an absolute duty to disclose that information or to refrain from trading.

*Id.* at 240, 100 S.Ct. at 1121 (Burger, J. dissenting). Justice Brennan, concurring in the judgment, agreed with Justice Burger's presentation of the misappropriation theory, but thought it was not adequately charged. *Id.* at 239, 100 S.Ct. at 1120. Justices Blackmun and Marshall, dissenting, agreed generally with the Chief Justice's dissenting opinion, but thought that the theory was unnecessary to sustain the conviction. *Id.* at 245, 100 S.Ct. at 1123. The last hint of the Supreme Court's view of this alternative theory is found in Justice Stevens' concurrence, in which he remarks that "respectable arguments could be made" both in favor of and against the theory, but "[t]he Court wisely leaves the resolution of this issue to another day." *Id.* at 238, 100 S.Ct. at 1120.

October 31, 1981 was the day the Second Circuit cast its vote in favor of the theory in a case in which employees of investment banking firms "misappropriated confidential information concerning proposed merg-ers and acquisitions that was entrusted to their employers by corporate clients." *United States v. Newman,* 664 F.2d 12, 15 (2d Cir.1981), *aff'd after remand,* 722 F.2d 729 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983). Trading was effected surreptitiously and substantial profits were made. The Circuit reversed the District Court's dismissal of the indictment, which charged the defendants with securities fraud, mail fraud and conspiracy. The court did not require that a fraud be perpetrated against either the buyer or seller of a security. Rather, the court found a fraud perpetrated against the employer sufficient:

> The wrongdoing charged against appellee and his cohorts was not simply internal corporate mismanagement. In *United States v. Chiarella,* Chief Justice Burger, in dissenting, said that the defendant "misappropriated—stole to put it bluntly—valuable nonpublic information entrusted to him in the utmost confidence." That characterization aptly describes the conduct of the connivers in the instant case.

> Had appellant used similar deceptive practices to mulct Morgan Stanley and Kuhn Loeb of cash or securities, it could hardly be argued that those companies had not been defrauded. By sullying the reputations of Courtois' and Antoniu's employers as safe repositories of client confidences, appellee and his cohorts defrauded those employers as surely as if they took their money.

*Id.* at 17 (citations omitted). The opinion also states that Newman and his colleagues wronged the clients of the investment banking firms, "whose takeover plans were keyed to target company prices fixed by market forces, not artificially inflated through purchases by purloiners of confidential information." *Id.*

More recently, the Second Circuit reaffirmed its acceptance of the misappropriation theory in a case which was *Chiarella*'s facts revisited. *SEC v. Materia,* 745 F.2d 197 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2112, 85 S.Ct. 477

(1985). Materia was a copyholder in a financial printing firm, who also learned how to fill in the blanks in tender offer documents handled by his employer. He too purchased the target companies' securities and made substantial profits when the offers were made public. The Court firmly restated the essential holding of *Newman:* "one who misappropriates nonpublic information in breach of a fiduciary duty and trades on that information to his own advantage violates Section 10(b) and Rule 10b–5." *Id.* at 203.

Winans is said to have misappropriated a certain type of market-sensitive confidential information—the nature and timing of Wall Street Journal articles. The theft of this information is said to have operated as a fraud on the Wall Street Journal, which was in connection with the purchase and sale of securities in the featured stocks.

Relying on a number of arguments, defendants distinguish *Newman* and *Materia* on the grounds that Winans' conduct is entirely different and is not a proper basis for a securities fraud violation. First, they argue that the premise of both *Materia* and *Newman* was that the employees in those cases had not only stolen information from their employers, but from their employers' clients—the acquiring companies. Without such a third party, to find Winans' conduct to be a misappropriation of information would lead to what they perceive as a major inconsistency—the Wall Street Journal could trade on such information because it could not misappropriate information from itself.[6] In contrast, the employers in both *Newman* and *Materia* would not have been able to trade on the information, since they would still be misappropriating information from their clients.[7]

First, we note that the language of both *Materia* and *Newman* strongly supports a reading that the existence of third parties is not an essential element. The *Newman* decision discussed the wrong to the employer as a separate matter with the wrong to the clients mentioned as an additional point: the focus of the holding was on the fiduciary relationship between employer/employee. *See Newman, supra,* 664 F.2d at 17–18. While the *Newman* facts involved an additional harm to a third party, the case nowhere states that the harm to the employer must also encompass some harm to a client. Similarly, in *Materia,* the court emphasized the fraud on the employer and not whatever wrong was committed against the client:

> Among a financial printer's most valuable assets is its reputation as a safe repository for client secrets. By purloining and trading on confidences entrusted to Bowne, it cannot be gainsaid that Materia undermined his employer's integrity ... Accordingly, we are driven to the conclusion that, by his misappropriation of material nonpublic information, Materia perpetrated a fraud upon Bowne.

745 F.2d at 202 (citation omitted). Once again, the facts included some harm to a

---

**6.** We do not see why it is such an anomaly that an employer and an employee could not be prosecuted under the same theory. We agree with the government that this argument is reminiscent of Chiarella's unsuccessful Second Circuit claim that because a tender offeror could purchase up to 5% of the target stock without disclosure, he too should be allowed to trade prior to a public announcement. *United States v. Chiarella,* 588 F.2d at 1366. It was in the course of explaining why Chiarella should not be treated like the offeror that the court discussed the alternative misappropriation theory.

**7.** The first indictment filed in this case alleged that Winans "violated his duties owed to the readers of the Wall Street Journal, including a duty to disclose that Winans and his co-conspir-

ators had traded in securities knowing that the Wall Street Journal would publish articles written by Winans or others concerning those securities; that Winans and his co-conspirators traded in such securities expecting that such columns or articles would affect the price and with the intent to profit from the change in price and that Winans and his co-conspirators intended to and did trade in such securities by selling their stock or options or covering short sales immediately after such columns or articles appeared, with the intent to profit from the change in price." The defendants argue that when the government dropped the theory resting on a duty to the WSJ readers, it lost its ability to follow the analysis of *Materia* and *Newman.* We disagree for the reasons stated in the text.

third party, but the language of the case in no way implies that the misappropriation theory requires anyone outside the employer/employee relationship to have been affected. While the defendants phrase the distinction in terms of the existence of a contractual relationship, trying to confine *Materia* and *Newman* to the facts in this way is an implicit return to the view that a securities fraud can only be perpetrated against a buyer or seller of securities, a view clearly rejected in *Newman*. 664 F.2d at 17.

To support the argument that a client is a necessary figure in the misappropriation theory, defendants rely heavily on *Dirks v. SEC*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). Dirks was an investment analyst who received material, nonpublic information from insiders of Equity Funding, which indicated that the assets of the corporation were "vastly overstated as the result of fraudulent corporate practices." *Id.* at 649, 103 S.Ct. at 3258. Although he himself did not trade on the information, he disclosed it to a number of clients and investors who sold their holdings in Equity Funding. The *Dirks* opinion attempted to delineate who fell within the purview of "insider trading" and reiterated the holding of *Chiarella* that a duty to disclose can only exist if there is a "specific relationship between the shareholders and the individual trading on inside information." *Id.* at 655, 103 S.Ct. at 3261. To find a derivative breach, there must have been a breach by a corporate insider of a duty owed to the company's shareholders about which the tippee knew or should have known. *Id.* at 660, 103 S.Ct. at 3264. In its famous footnote fourteen, the *Dirks* Court explained that a certain category of temporary insiders, or quasi-insiders, such as lawyers and accountants, would also have such a duty: "For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed non-

public information confidential, and the relationship must imply such a duty." *Id.* at 655 n. 14, 103 S.Ct. at 3261 n. 14.

To find *Dirks* controlling would be to find no securities violation here, since Winans was not a temporary insider, did not owe any duty to the corporations he wrote about, and was not a tippee of any corporate inside information. In terms of the securities laws, neither Winans nor the Wall Street Journal owed any duties at all to the corporations that were the subject of *Heard* columns or to the shareholders of those corporations. However, the duties that *Dirks* addressed are not the ones under scrutiny in *Newman, Materia,* or here. *Dirks* simply did not address the misappropriation theory, the Court having found that Dirks did not "misappropriate or illegally obtain the information." *Id.* at 665, 103 S.Ct. at 3267; *see also Bateman Eichler, Hill Richards, Inc. v. Berner,* — U.S. —, —, 105 S.Ct. 2622, 2630, 86 L.Ed.2d 215 (1985).

The *Dirks* case outlined the contours of one type of insider trading, where a corporate insider or his tippee perpetrates a fraud on the shareholders in breach of a corporate duty. That Newman or Materia might have been prosecuted as footnote fourteen insiders does not undermine the Second Circuit's misappropriation analysis, which focuses on the employer/employee fraud, an entirely different relationship from the one at issue in *Dirks*. *Materia* was decided after *Dirks,* and the absence of any discussion of the case leads us to conclude that the Circuit did not believe that the tipper/tippee approach was relevant to the misappropriation theory.[8]

The essential point is that the misuse of corporate inside information is not the only type of fraud that the securities laws cover, which was made clear in *Materia:*

> We hold that such activity falls squarely within the "fraud or deceit" language of

---

**8.** On March 13, 1985, the SEC filed a Notice of Motion for Leave to Participate as Amicus Curiae, with an accompanying Memorandum of Law in Opposition to the Defendants' Motions for Acquittal. We hereby grant the motion.

One of the points that the SEC makes is that the Commission addressed *Dirks* in its brief to the Second Circuit in *Materia*. The government also states that Materia made *Dirks*-based arguments in his brief to the Second Circuit.

the Rule. Legislative history to the Securities Exchange Act of 1934 makes clear that the antifraud provision was intended to be broad in scope, encompassing all "manipulative and deceptive practices which have been demonstrated to fulfill no useful function." S.Rep. No. 792, 73d Cong., 2d Sess., 6 (1934). This language negates the suggestion that the provision was aimed solely at the eradication of fraudulent trading by corporate insiders.

745 F.2d at 201. It is not accurate to say that *Dirks* wrote the book on insider or outsider trading; it wrote one chapter with respect to one type of fraudulent trading. That type is not before us.[9]

Nor do we believe that the misappropriation theory hearkens back to the "parity of information" doctrine, which has been rejected by the Supreme Court. That doctrine states in essence that all investors should have relatively equal access to material information in order to preserve the market's integrity. Brudney, "Insiders, Outsiders, and Informational Advantages under the Securities Laws," 93 Harv.L.Rev. 322, 339 (1979). *Chiarella*'s holding that "a duty to disclose under Section 10(b) does not arise from the mere possession of non-public market information" clearly rejects any approach based on a mere informational advantage. 445 U.S. at 235, 100 S.Ct. at 1118; *see also Dirks, supra,* 646 U.S. at 657, 103 S.Ct. at 3262. The *Chiarella* majority also did not accept the view that an informational advantage which is not "legally available to others," known as the access to information theory, should be the basis for drawing the line. 445 U.S. at 235 n. 20, 100 S.Ct. at 1118 n. 20; *see also Dirks, supra,* 463 U.S. at 672, 103 S.Ct. at 3270. But we do not agree that the misappropriation theory is in conflict. The focus of the approach before us is not on whether the defendant had an informational advantage that *others* could not legally obtain,

but on how the defendant gained the advantage, which must be fraudulently.

To look at conduct rather than information is actually quite consistent with *Dirks,* in which the Supreme Court also held that a corporate insider only breaches a duty to shareholders if he or she personally benefits from the disclosure. In support of that point (which was sharply disputed by the dissenters), a statement by SEC Commissioner Smith was approvingly quoted: "It is important in this type of case to focus on policing insiders and what they do ... rather than policing information per se and its possession." *Dirks, supra,* 463 U.S. at 662–63, 103 S.Ct. at 3265.

What made the conduct here a fraud was that Winans knew he was not supposed to leak the timing or contents of his articles or trade on that knowledge. He knew that these columns were likely to affect the price of the stocks to his benefit. This is true even if he had not known of a written policy; he had knowledge of a Wall Street Journal practice, that is, a rule of conduct, which makes this a clear breach of a fiduciary duty. The government concedes that without any policy, there could be no prosecution under the misappropriation theory. We are not entirely sure that such a concession was necessary, but we understand it to mean that, if the Wall Street Journal could not show that it had set out the rules, it could not be said that Winans had breached any duty. The contention that criminal liability cannot be premised on as broadly-stated and aspirational a set of guidelines as the Dow Jones policy is just not persuasive. While the policy itself tries to cover many ethical grey areas, and it may be difficult to tell whether some conduct fits within the guidelines, this case does not present any such problems. Winans breached the policy and he knew he was breaching it.

---

**9.** The misappropriation theory has been found to support an indictment involving the tipping of corporate inside information. In *United States v. Reed,* 601 F.Supp. 685 (S.D.N.Y.1985), there was no allegation that the corporate insid-

er tipped his son for personal gain. Since such a finding is essential to *Dirks'* derivative liability, that case's analysis was inapplicable. Nonetheless, Judge Ward upheld the indictment on the misappropriation theory.

Nor do we find the fact that criminal liability is being premised on corporate internal policy unprecedented. The indictment in *Newman* charged the defendants with "violating the fiduciary duties of honesty, loyalty and silence owed directly to [the investment banking firms], and clients of those investment banks," duties as broadly phrased as any found in the conflicts policy. 664 F.2d at 16. Similarly, Materia's fraud was the violation of a company policy, and the fraud was defined as a breach of a fiduciary duty. *Materia, supra,* 745 F.2d at 203. In the mail fraud context, the question of criminal liability premised on internal corporate policy has been addressed directly, and endorsed, rather than found troublesome:

> Our discussion is not to be construed as holding that an employee's duty to disclose material information to his employer must be imposed by state or federal statute. Indeed, the employment relationship, by itself, may oblige an employee not to conceal, and in fact to reveal, information he has reason to believe is material to the conduct of his employer's business.

*United States v. Von Barta,* 635 F.2d 999, 1007 (2d Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981). Even if we could accept newspaper articles as definitive proof that other newspapers do not have similar policies, that would not change the result in this case, where we are dealing with a specific employment relationship.[10]

Counts Twenty-Six through Forty-Three charge the defendants with wire fraud in violation of 18 U.S.C. § 1343. The same trades form the basis for Counts Forty-Four through Sixty-One in violation of 18 U.S.C. § 1341, the mail fraud statute.[11] The parallel language of both statutes has led courts to give them both the same construction. *Von Barta, supra,* 635 F.2d at 1005 n. 11. For ease of discussion, we will only refer to the mail fraud charges.

These "seemingly limitless provisions," *id.* at 1001, prohibit the use of the mails to execute "any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretense, representations or promises," 18 U.S.C. § 1341.[12] While the language of the stat-

**10.** On January 21, 1985, the Reporters' Committee for Freedom of the Press, the National Association of Broadcasters, the Newsletters Association, the New York Financial Writers Association, the Media Institute, the Newspaper Guild, the Radio-Television News Directors Association, the American Society of Magazine Editors, the National Newspaper Association, and the Associated Press Managing Editors filed a motion for leave to file a brief as amici curiae in support of defendants' Rule 29 motion to dismiss various counts of the indictment. They filed another motion for leave to file a supplemental memorandum on April 23, 1985. Because of the timing of the latter motion, we did not require the government to respond to the points raised. However, we hereby grant both motions.

The arguments made by the amici with respect to the proper construction of the securities laws are adequately addressed in the text. Amici make a more narrow argument that states in essence that the government's theory rests on ill-defined duties for reporters and editors; criminalization of breaches of those duties will interfere with the editorial process and will create a threat to the amici's First Amendment freedoms. We are not persuaded that the government's theory does create any new duties; as the government stated in their reply brief,

"this prosecution under the 'misappropriation' theory creates no obligations, but merely enforces pre-existing obligations as it finds them." Nor does the theory impose any duties at all on publishers and editors as to what they must do if a reporter does disclose trading or tipping. Editors must make decisions about whether or not to run articles all the time, and this theory does not affect that choice at all. If Winans were to have disclosed to his editors prior to publication the fact that he was trading in the stock slated to be the subject of a *Heard* column the following day, the editors had several choices open to them, including running the column and taking disciplinary action against Winans for his misconduct, as well as seeking criminal penalties.

**11.** The government dropped Count 40 as to Carpenter and Felis, Count 43 as to Felis, and Counts 58 and 61 as to Carpenter and Felis.

**12.** Defendants acknowledge that "[i]ntangibles such as 'confidential and nonpublic commercial information' fall within the definition of 'property' under the mail fraud statute." *United States v. Newman,* 664 F.2d 12, 19 (2d Cir.1981) (quoting *United States v. Louderman,* 576 F.2d 1383, 1387 (9th Cir.), *cert. denied,* 439 U.S. 896,

utes may be broad, the government's theory of the case follows two specific routes of analysis. First, the government argues that Winans' conduct constituted an abuse of his employers' confidences, and under one line of cases meets the requirements of a fraudulent scheme for that reason alone. *Haas v. Henkel*, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569 (1910); *United States v. Hasenstab*, 575 F.2d 1035 (2d Cir.), *cert. denied*, 439 U.S. 827, 99 S.Ct. 100, 58 L.Ed.2d 120 (1978); *United States v. Girard*, 601 F.2d 69 (2d Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979); *Abbott v. United States*, 239 F.2d 310 (5th Cir. 1956); *United States v. Kent*, 608 F.2d 542 (5th Cir.1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980); *United States v. Buckner*, 108 F.2d 921, 924–25 (2d Cir.), *cert. denied*, 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016 (1940); *United States v. Groves*, 122 F.2d 87, 90 (2d Cir.), *cert. denied*, 314 U.S. 670, 62 S.Ct. 135, 86 L.Ed. 536 (1941). Alternatively or additionally, the government argues that the fraud was Winans' breach of a fiduciary duty owed to the Wall Street Journal, when he had a duty to disclose both the leaks and his own trading to his employer. *Von Barta, supra*, 635 F.2d 999; *United States v. Bronston*, 658 F.2d 920 (2d Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982); *United States v. Margiotta*, 688 F.2d 108 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Siegel*, 717 F.2d 9 (2d Cir.1983); *United States v. Weiss*, 752 F.2d 777 (2d Cir.1985).

On the facts of this case, these theories overlap and become virtually indistinguishable. Winans' disclosures can only be seen as an abuse of his employers' confidences since he owed a fiduciary duty to the Wall Street Journal not to disclose the contents

of the column in advance. Analogous facts tested the theory in *United States v. Newman*, 664 F.2d 12 (2d Cir.1981), a case already discussed in connection with the securities counts. In reversing the district court's dismissal of the indictment, the Second Circuit found the indictment's charges of fraudulent misappropriation of confidential information and the failure to disclose material information where there was a fiduciary duty to do so "a sufficient averment of wrongdoing" under the mail fraud statute and the applicable case law. *Id.* at 19–20.

█ Defendants argue that the mere breach of a fiduciary duty or an employee's failure to honestly serve his employer cannot serve as the basis for a mail fraud prosecution. *Weiss, supra*, 752 F.2d 777; *Siegel, supra*, 717 F.2d at 14. However,

> [t]he additional element which frequently transforms a mere fiduciary breach into a criminal offense is a violation of the employee's duty to disclose material information to his employer.

*Von Barta, supra*, 635 F.2d at 1006; *see also Weiss, supra*, 752 F.2d 777; *Siegel, supra*, 717 F.2d 9. This is not a case in which the government can be accused of bootstrapping a duty to disclose onto a fiduciary duty. Even Winans' admission that he knew that what he was doing violated a "practice," which if discovered would result in his dismissal, leads inexorably to a finding that he breached a fiduciary duty. His conduct also establishes his awareness that he had a duty not to disclose the content and timing of publication of the column as well as a duty to disclose, at the very least, any leaks of the column.

The argument that Winans' theft of confidential information was not necessarily a fraud fails because of the existence of a duty to disclose.[13] It is entirely irrelevant

---

99 S.Ct. 257, 58 L.Ed.2d 243 (1978)). Nonetheless, they object to that construction in light of the absence of any express ruling by the Supreme Court on the issue.

**13.** It is a bit absurd to say that an element of Winans' crime was that he did not tell the Wall Street Journal he was committing it. But, what distinguishes our case from a "mere breach of a

fiduciary duty" is the same element that existed in *Newman:* "[t]he scheme included breach of the employees' fiduciary duties by material misrepresentations to the employer and non-disclosure of material information required to be disclosed." *Newman, supra,* 664 F.2d at 19. Winans may not have made any material misrepresentations to his employer before the SEC inves-

that he did not have to break into any locked files to find out when his own articles were going to run. Whatever ambiguities may lurk in the language of the Dow Jones Conflicts of Interest Policy, the activity Winans participated in did not fall between any of the cracks. Even if Winans' testimony is accepted in its entirety, he did not have to be aware of the existence of a Conflicts of Interest Policy, much less a written one, to know that his activities violated a practice, were unethical and would lead to dismissal. The level of notice required to let an employee know that his conduct would amount to a breach of a fiduciary duty has been accepted on much weaker facts than these. *Von Barta, supra,* 635 F.2d at 1002 (high-level employee with a great deal of discretion verbally admonished "never to jeopardize the firm's banking relationships" and always to advise his employer if the firm's repurchase agreements "were in trouble").

■ Other elements of the mail fraud counts are also contested. The government must prove "that some actual harm or injury [to the scheme's victims] was at least contemplated." *Von Barta, supra,* 635 F.2d at 1006 n. 14. It need not be proven or alleged that the victim was actually defrauded, since the statutes forbid a scheme to defraud and not actual fraud. *United States v. London,* 753 F.2d 202, 205 (2d Cir.1985). Like the securities counts, the mail fraud charges rest on the theory that the Wall Street Journal was the victim of the fraud. The harm suffered was an alleged reputational injury; as a result of having a reporter engaged in such unethical conduct, the Wall Street Journal's reputation for journalistic integrity was sullied. Defendants argue that there was no harm to the alleged victim as a matter of fact, and that reputational injury is too nebulous and ill-defined to support a mail fraud violation.

■ As to the question of whether the Wall Street Journal's reputation suffered as a result of this matter, the point is not relevant. Defendants questioned a number of witnesses about their perceptions of the Journal's reputation and introduced evidence relating to the financial success of the newspaper in the past year. Government witnesses also testified to their views of the newspaper's reputation; they recited anecdotes about strained relationships with sources and complaints from readers about reporters "on the take." Obviously, whatever reputational damage occurred in connection with the events of this trial, the Wall Street Journal has not been driven out of business.

All that must be shown is that "some harm or injury was contemplated by the alleged scheme." *London, supra,* 753 F.2d at 206; *see also Siegal, supra,* 717 F.2d 9. Further, "[harm or injury] may be inferred 'when the scheme has such effect as a necessary result of carrying it out.'" *London, supra,* 753 F.2d at 206 (quoting *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1181 (2d Cir.1970). The scheme's injurious consequences to the Journal must have been known to Winans. It is obviously untenable to argue, as the defendants do, that since the conspirators never intended to get caught, they could not have contemplated that the Wall Street Journal would be harmed.

In the most relevant case law, the misappropriation of confidential information has virtually been presumed to be injurious to the employer whose confidence is betrayed. *See Materia, supra,* 745 F.2d 197; *Newman, supra,* 664 F.2d 12. Defendants distinguish those cases on the ground that the injury to reputation in those circumstances was premised on the contractual relationship between the employer and the employer's client; that is, the corporate clients who entrusted their takeover and merger plans to investment banking firms and printers are necessary third parties to

tigation, but he knew all along that the Journal cared about leaks. The scheme was also a fraud and not a "mere theft" because the scheme's "'object was to filch from [the employer] its

valuable property by dishonest, devious, reprehensible means.'" *Id.* at 19 (quoting *Abbot v. United States,* 239 F.2d 310, 314 (5th Cir.1956)).

make the reputational injury fly. We fail to see the significance of that distinction for the reasons already discussed in the securities law section.

Moreover, the fraudulent misappropriation or theft of the WSJ's property is in itself sufficient to satisfy the requirement of contemplation of harm. The theft of valuable property is of course a crime even if the victim is unaware of the loss. Here, the fraudulent taking and misuse of the confidential information stolen from the WSJ placed immediately in jeopardy probably its most valuable asset—its reputation for fairness and integrity. These conspirators, with their intimate knowledge of the financial and stock markets and of the influential role that the *Heard* column played in these markets, were hardly unaware of the potentially devastating harm that their fraudulent acts could cause to the WSJ.

■ All of the defendants assert that the mailing and wiring of Winans' articles is an insufficient jurisdictional basis for the mail and wire fraud counts. The mailing requirement is another limitation placed on the breadth of the statutes:

> The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.

*Kann v. United States,* 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944). The use of the mails must be "incident to an essential part of the scheme." *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954). Moreover, one "causes" the mails to be used "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business or where such use can reason-

ably be foreseen, even though not actually intended." *Id.* at 8–9, 74 S.Ct. at 362–363.

The defendants argue that the telexing of articles for printing and the mailing of the Wall Street Journal to subscribers were legitimate, routine and inevitable uses of the wires and mails, wholly unaffected by Winans' trading activity. Whether or not Winans wrote a Heard on the Street column, and whether or not he provided leaks to Brant about the column, the Wall Street Journal would have been published every day. Moreover, they argue that Winans was required to write his articles for publication as a condition of his employment; he fulfilled that obligation by writing his "journalistically pure" columns.

Defendants primarily rely on a Third Circuit case, which held that the mailing of packing slips with phonographic records was an insufficient basis for a mail fraud charge. *Tarnopol v. United States,* 561 F.2d 466, 472 (3d Cir.1977). While there is language in the opinion dealing with the routine nature of the business mailings at issue, the case did not create any per se rule for routine business mailings. Rather, as the Third Circuit subsequently explained:

> [*Tarnopol*] merely applied the already established notion that mailings which are too remote from a fraudulent scheme will not support a mail fraud charge.

*United States v. Brown,* 583 F.2d 659, 667 (3rd Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979). The packing slips of *Tarnopol* were not only legitimate and routine mailings, but were also entirely unrelated to the scheme. In fact, the court noted that "the fraud would have been better served if no packing slips had been in existence." *Tarnopol, supra,* 561 F.2d at 473.[14]

---

**14.** Nor is this case anything like *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960) where the mailing of a tax bill was held to be insufficient to substantiate a mail fraud charge, even though the defendants subsequently embezzled the proceeds. The legal mandate compelling the mailings in *Parr* is not analogous to Winans' employment require-

ments. In *Parr,* the Court noted that "the factual situation is unique," *id.* at 391, 80 S.Ct. at 1183, that is, the mailing in question was required by law. Moreover, the Court relied substantially on the fact that the indictment did not allege that the mailings were part of the offense. *Id.* at 392, 80 S.Ct. at 1184.

Here, however, the publication and distribution of the Wall Street Journal was an integral part of the scheme to defraud. While defendants argue that the mailings were *unaffected* by the fraud, they do not, and cannot assert that the mailings were *unrelated* to the scheme, which is the proper focus. The fact that an innocent third party actually made the jurisdictional communication is of no consequence, since the wirings and mailings were reasonably foreseeable. *United States v. Muni,* 668 F.2d 87, 89 (2d Cir.1981). This is hardly a situation where the nexus between the mailings and wirings and the alleged fraud is too remote; without publication and distribution of the copies of the Journal containing the columns in question there would be no point to the scheme.[15]

The government must also establish that the defendants acted with specific intent, a discussion equally applicable to the mail, wire and securities fraud counts. *Dirks, supra,* 463 U.S. at 663 n. 23, 103 S.Ct. at 3265 n. 23. As the Second Circuit stated:

> This specific intent requirement is sometimes used to distinguish actual and constructive fraud. Actual frauds are intentional frauds. Constructive frauds involve breaches of fiduciary or equitable duties where intent to deceive is lacking. Only actual frauds are within the purview of the mail fraud statute.

*Von Barta, supra,* 635 F.2d at 1005 n. 14 (citations omitted). The basic definition of this term is

> To act with "intent to defraud" means to act knowingly and with the specific intent to deceive ordinarily for the purpose of either causing some financial loss to another, or bringing about some financial gain to one's self.

2 Devitt & Blackmar, Federal Jury Practice and Instructions § 47.08 (3d ed. 1977); Sand, Modern Federal Jury Instructions

¶ 44.01 (1984); *United States v. Niro,* 338 F.2d 439, 440 n. 2 (2d Cir.1964).

The essence of the defendants' argument is that to have intended to defraud the Wall Street Journal, each defendant would have to know the specifics of the conflicts of interest policy. Their argument goes so far as to say that each defendant had to know the precise language of the written conflicts policy that was being violated.

We do not agree that the specific intent requirement is meant to be quite that specific. Nor do we believe that such a precise knowledge of what type of wrong Winans was committing at the Journal is necessary to show that any defendant aided and abetted the fraud. The government is not required to prove actual knowledge by each defendant, of every detail that made the scheme a fraudulent one. Nor is the government required to show that the defendants intended to violate the law, since ignorance of the law is no defense. *See, e.g., United States v. Gregg,* 612 F.2d 43, 50 (2d Cir.1979); *United States v. Berardelli,* 565 F.2d 24, 30 (2d Cir.1977).

Our focus is on whether the defendants intended to deceive the Journal, or aided and abetted Winans in his efforts to deceive the Journal. The defendants need not have known about every particular of the conflicts of interest policy to have knowledge that the Wall Street Journal was being defrauded by Winans for his own financial gain.

With respect to the mail and wire fraud counts (as well as the securities fraud counts), good faith would be a complete defense: the burden is on the government to show lack of good faith beyond a reasonable doubt. *United States v. Bronston,* 658 F.2d 920, 930 (2d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982). This defense is raised by Felis, who asserts that he never be-

---

**15.** Testimony from Daniel Hinson, an Assistant Managing Editor of the WSJ, Richard L. Graff, an Associate National Circulation Service Manager at Dow Jones & Co. and Kenneth Rodin, a general supervisor at the U.S. Postal Service established that these stories were transmitted by telecopier from the Wall Street Journal at 22 Courtlandt Street, New York, New York to Chicopee, Massachusetts and elsewhere for printing in the newspaper. The newspapers are also mailed to some 22,000 subscribers in the Southern District of New York.

lieved that this arrangement was illegal. He relies, in part, on a conversation with Brant, although Felis knew that Clark was the source of that legal opinion. He also relies on the conversation with Krantz.

■■■■ Reliance on the advice of counsel is not an absolute defense, but is one factor to be considered in assessing good faith and intent. *United States v. Financial Committee to Re-Elect the President,* 507 F.2d 1194 (D.C.Cir.1974). Essential to any claim based on reliance on counsel is that the attorney must have been fully informed of all the relevant facts. *United States v. Stirling,* 571 F.2d 708, 735 (2d Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978); *United States v. King,* 560 F.2d 122, 132 (2d Cir.), *cert. denied,* 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977). It is also a difficult argument to make when the attorney whose advice was relied on was a participant in the scheme: in such a case, "legal assurance was not sought because acting within the framework of the law was not the reason appellants elected to deal with members of the Bar." *United States v. Shewfelt,* 455 F.2d 836, 839 (9th Cir.), *cert. denied,* 406 U.S. 944, 92 S.Ct. 2042, 32 L.Ed.2d 331 (1972). Any attorney whose advice is later used to establish good faith must have been "unbiased and competent." *Financial Committee, supra,* 507 F.2d at 1198.

Defendants also argue that this criminal prosecution offends the Due Process clause, since they lacked fair notice of the criminality of their conduct. As the Second Circuit has stated,

All the Due Process clause requires is that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden, and thus not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope.

*United States v. Herrera,* 584 F.2d 1137, 1149 (2d Cir.1978). There need not be any litigated fact pattern directly on point. *United States v. Ingredient Technology*

*Corp.,* 698 F.2d 88, 96 (2d Cir.), *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983). The fair notice argument has been repeatedly rejected in the Rule 10b-5 context on a wide variety of fact patterns. *Newman, supra,* 664 F.2d at 18-19; *Chiarella,* 588 F.2d at 1369; *United States v. Brown,* 555 F.2d 336, 339-40 (2d Cir.1977); *United States v. Persky,* 520 F.2d 283, 286-88 (2d Cir.1975); *SEC v. Shapiro,* 494 F.2d 1301, 1308 (2d Cir.1974). Defendants' numerous deceptive acts hardly support the notion that they had no idea that they were committing a wrongful act. As the Circuit remarked in *Newman,* "[i]n other areas of the law, deceitful misappropriation of confidential information by a fiduciary, whether described as theft, conversion, or breach of trust, has consistently been held to be unlawful," and defendants "would have had to be most ingenuous to believe that Congress intended to establish a less rigorous code of conduct under the Securities Acts." *Newman, supra,* 664 F.2d at 18.

### III

We conclude as follows. The conspiracy began on October 16, 1983, when Winans and Brant agreed to trade on advance information concerning the timing and content of Wall Street Journal articles. Felis was promptly informed by Brant of the arrangement and agreed to participate. The three of them continued as active participants in the conspiracy to defraud and to obstruct justice when the SEC began its investigation in March 1984. The evidence which we have reviewed in detail above establishes beyond any doubt the fraudulent scheme, to which each of them knowingly and wilfully subscribed. With the exception of the first three trades (relating to American Surgery and Institutional Investors) listed in the indictment as overt acts, each of the remaining overt acts were committed by a conspirator in the Southern District of New York at the time alleged in furtherance of the conspiracy.

■■■■ We find that Carpenter never joined the conspiracy with Winans, Brant

and Felis. He initially had a vague understanding of a business arrangement between the three; the nature of that arrangement became clearer to him over time, and by the end of the year he was fully aware of what was going on. We are loathe to dwell on Carpenter's "spousal relationship" defense, since it carries with it assumptions about spousal roles which would only be true for the most subservient spouse. Nevertheless, the government has not shown beyond a reasonable doubt that Carpenter ever reached any agreement with the other conspirators. The arrangement was never substantively discussed in his presence, his participation was never sought until the last month, and, with the exception of Brant's gift of travel money, Carpenter was never given a share of the profits distinct from Winans' share. He was treated as Winans' uninvolved spouse, consistent with the nature of their relationship; he did not act as a conspirator, nor was he perceived as such by Winans, Brant or Felis.

Nor was the role played by Carpenter in the last month of the scheme, when the SEC began its investigation, that of a conspirator. He primarily acted as a messenger boy between Winans and Brant and Felis. There is no question that he produced the fake invoices. However, Carpenter stalled repeatedly before finally producing the invoices under substantial pressure from Brant and Felis. They were also done so badly that Carpenter's handiwork may well have been a deliberate failure to comply with any plan to obstruct justice. Indeed, those invoices were never used to thwart the SEC investigation, but were revealed to the SEC by Carpenter himself at the time of his voluntary testimony. In short, he was at no time a willing participant in any aspect of the conspiracy.

We do not find Felis' assertions of good faith believable. He argues that he never believed the trading arrangement to be illegal or improper except from a Kidder Peabody "appearance" point of view. This is said to explain Felis' lies to Kidder Peabody executives and his trip to Switzerland to open the Western Hemisphere account. However, while Brant did tell Felis that the arrangement was legal at the time of its inception, Felis was aware that the source of this legal advice was David Clark. Not only was Clark a participant in the scheme, but Felis' own witness, Casey Enright, testified that she and Diane Hackett told him not to trust Clark.

Nor can Felis rely on the meeting with Krantz, in which Krantz expressed some confusion about the Supreme Court's recent pronouncements on insider trading. Krantz did not have all the material facts, since Brant and Felis had lied to him, and he never stated that trading on advance information from the WSJ was not illegal. The testimony of Brant's and Felis' assistants that Brant, Felis and Krantz emerged from that meeting all smiles, is fully consistent with what happened at that meeting. Krantz thought the problem was solved by Clark's decision to move his trading and Brant and Felis thought the problem was solved because Kidder Peabody was satisfied that they were doing nothing illegal. Felis' conduct throughout demonstrates that he was a willful and knowing participant in what he understood was an unlawful venture.

As to the securities counts, Winans and Felis employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit on the Wall Street Journal and Dow Jones & Co., Inc. Each did so by means and instrumentalities of interstate commerce, the mails and facilities of national securities exchanges in connection with the purchase or sale of securities alleged in the securities counts.[16] We find that Winans and Felis, together with Brant, each had the requisite specific intent to defraud.

**16.** Winans and Felis, as parties to the conspiracy, are each responsible for the substantive offenses committed by a co-conspirator in furtherance of the conspiracy, regardless of any participation in the substantive offense or any actual knowledge of that offense. *Pinkerton v. United States,* 328 U.S. 640, 645–48, 66 S.Ct. 1180, 1183–85, 90 L.Ed. 1489 (1946).

Carpenter, although not a conspirator, did aid and abet the scheme. During his one and a half years at the WSJ, he became aware of the rules of the game and consequently knew that what Winans was doing was a fraud on the WSJ. He endorsed the checks made out to him by Brant or Felis, allowed Winans to trade in his name in the Merrill Lynch and Schwab accounts, and to that extent willfully participated in the criminal venture and helped it succeed.

We make no distinctions between the various counts, finding none of the defendants' distinctions persuasive. It makes no difference that one transaction was charged as mail and wire fraud, but not as securities fraud, or that the government combined trades in two different accounts in some counts, but charged those transactions separately in others. Nor does it make a difference that some of these transactions resulted in losses. *Materia* does require that the trading be to the defendant's "own advantage," but that language speaks to the intent requirement insofar as the misappropriator must have been motivated by personal gain; we do not agree that the misappropriator must have made a profit on each transaction. Moreover, all of these trades were pursuant to a long-term plan. The three losing trades show that the venture was not entirely risk-free, but there is no doubt that the arrangement was very profitable as a whole. Lastly, there is no principled distinction between columns written by someone other than Winans or articles other than *Heard* columns; the crime was in the disclosure of the newspaper's contents and the trading on the basis thereof.

As to mail and wire fraud counts, Winans and Felis devised and participated in a scheme and artifice to defraud the Wall Street Journal and to obtain money and property of the WSJ by means of false and fraudulent pretenses and representations. Once again, Carpenter aided and abetted the scheme to the extent charged in the indictment. Each defendant, by virtue of the scheme itself, contemplated harm to the Journal's reputation. Winans caused the jurisdictional mailings and wirings by submitting them for publication after leaking them to Brant and Felis.

Accordingly, we find defendant Winans guilty on Counts 1 through 18, 20 through 24, and 26 through 61, inclusive, as charged in the superseding indictment. We find David Carpenter guilty of Counts 14, 17, 18, 21, 22, 24, 38, 41, 42, 56, 59 and 60. Lastly, we find defendant Felis guilty of Counts 1 through 13, 15, 16, 20, 23, 26 through 33, 36, 37, 39, 41, 44 through 51, 54, 55, 57 and 59. Dates for sentencing will be determined in consultation with counsel.

SO ORDERED.